FILED

2022 Dec-05  PM 02:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **Kisha Dowling, individually and on behalf of R.E.,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:18-cv-00373-MHH** |
| | } | |
| **Limestone County Board of Education,** | } | |
| | } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

In this action, Kisha Dowling challenges the decision of an independent hearing officer—an IHO—who found that the Limestone County Board of Education did not fail to provide her son, R.E., with a free and appropriate public education—FAPE—pursuant to the Individuals with Disabilities Education Act. Ms. Dowling asks the Court to review the IHO's findings and provide relief under the IDEA. She also asserts claims against the Board under § 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Due Process Clause of the Fourteenth Amendment.

1

The Board has asked the Court to enter judgment in its favor on Ms. Dowling's claims.  (Doc. 45).  This opinion resolves the Board's motion.  The opinion begins with a discussion of the statutory framework for the IDEA, § 504 of the Rehabilitation Act, and the ADA.  Then, the Court discusses the standards of review that a district court must use to evaluate the Board's motion.  Consistent with those standards, the Court identifies the evidence in the administrative record that the parties have submitted.  Finally, the Court evaluates the evidence under the governing legal standards.

## I.

Congress enacted the Individuals with Disabilities Education Act or IDEA to address its finding that children with disabilities "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'"  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179 (1982) (alteration in *Rowley*) (quoting H.R. Rep. No 94-332, at 2 (1975)).  The IDEA ensures that "children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

Under the IDEA, a "child with a disability" may be a child with an intellectual or learning disability or a child with a serious emotional disturbance or a health

impairment who, by virtue of the disability, "needs special education and related services." 20 U.S.C. § 1401(3)(A). Under the IDEA, a "free appropriate public education" is:

> special education and related services that—
>
> > (A) have been provided at public expense, under public supervision and direction, and without charge;
> >
> > (B) meet the standards of the State educational agency;
> >
> > (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> >
> > (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9)(A)-(D). "Special education" means "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability." 34 C.F.R. § 300.39(a)(1).

Several IDEA procedures are relevant to Ms. Dowling's appeal: the evaluation process, the placement process, and the disciplinary process. As for evaluations, a local educational agency or LEA must "conduct a full and individual initial evaluation" of a student who may have a disability. 20 U.S.C. § 1414(a)(1)(A). Then "a team of qualified professionals and the parent of the child" must determine whether the child is a "child with a disability" as defined by the IDEA who is eligible "for special education and related services." 20 U.S.C. § 1414(b)(4)(A). If the team determines that the child is a "child with a disability"

who is eligible for special education and related services, then the team must develop, and the local educational agency must implement, an individualized educational plan or IEP for the child.  20 U.S.C. §§ 1414(d)(1)(A)(i), (2)(A).

An IEP must be "reasonably calculated to enable [a] child to make progress appropriate in light of [the child's] circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017).  An IEP includes "'a statement of the child's present levels of academic achievement and functional performance,' 'a statement of measurable annual goals,' and 'a statement of the special education and related services and supplementary aids and services … to be provided to the child.'"  *L.J. by N.N.J. v. Sch. Bd. of Broward Cnty.*, 927 F.3d 1203, 1207 (11th Cir. 2019) (omission in *L.J.*) (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i), 1414(d)(1)(B)).

> While the IEP should be "reasonably calculated to enable a child to receive educational benefits," *RL,* 757 F.3d at 1177 (citations omitted), the IDEA does not require an IEP to maximize the potential of each child with a disability comparable to the opportunity provided to children without a disability. *Rowley,* 458 U.S. at 200, 192 S.Ct. at 3048. Nor does the IDEA require an IEP to meet "any particular substantive educational standard." *Id.* Instead, the student with a disability must receive "personalized instruction with sufficient support services to permit the child to benefit educationally." *Id.*

*Phyllene W. v. Huntsville City Bd. of Educ.*, 630 Fed. Appx. 917, 919 (11th Cir. 2015) (quoting *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1177 (11th Cir. 2014), and *Rowley*, *supra*); *see also Weiss by Weiss v. Sch. Bd. of Hillsborough*

*Cnty.*, 141 F.3d 990, 998 (11th Cir. 1998) (holding that a school board is not required to maximize the potential of a child with a disability).

A school district must "develop and conduct a yearly review of an [IEP] that addresses the student's unique needs." *R.L.*, 757 F.3d at 1177 (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)(4)(A)). A school district must reevaluate a child with a disability "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(ii). A school district must conduct a reevaluation sooner if the agency determines that a student's educational needs "warrant a reevaluation" or "if the child's parents or teacher requests a reevaluation," 20 U.S.C. § 1414(a)(2)(A), but a district ordinarily should not reevaluate a student more than once per year, 20 U.S.C. § 1414(a)(2)(B)(i).

Turning to placement, a school district must educate a child with a disability in the "least restrictive environment" or LRE. The LRE requirement compels a local educational agency to "ensure that . . . [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled[.]" 34 C.F.R. § 300.114(a)(2)(i). An IEP team must determine and identify in a student's annual IEP the student's LRE for the academic year.

Finally, with respect to student discipline, when a school district decides "to change the placement of a child with a disability because of a violation of a code of student conduct," the child's IEP team must conduct a manifestation determination review or MDR. 20 U.S.C. § 1415(k)(1)(E)(i). The team must "review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—(i) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (ii) if the conduct in question was the direct result of the LEA's failure to implement the IEP." (20 U.S.C. § 1415(k)(1)(E)(i). If the team determines that "the conduct was a manifestation of the child's disability," then the child's IEP team either must "conduct a functional behavioral assessment, and implement a behavioral intervention plan" or, if the child already has a behavioral intervention plan, must review the plan and "modify it, as necessary, to address the behavior"  and "return the child to the placement from which the child was removed." 20 U.S.C. § 1415(k)(1)(F). If the team determines that the conduct was not a manifestation of the child's disability, then the child may proceed through the disciplinary process that governs children without a disability. 20 U.S.C. § 1415(k)(1)(C).[1]

---

[1] Ordinarily, a district does not have to conduct an MDR before changing the placement of a child with a disability if the child possessed a weapon at school or on the school premises, possessed or

To enforce the requirements of the IDEA, a school district or the parents of a child with a disability may "file a complaint with the appropriate state administrative agency and get a due process hearing" before an administrative hearing officer. *R.L.*, 757 F.3d at 1177 (citing 20 U.S.C. § 1415(f)(1)(A)).   A party who wishes to challenge the findings from the administrative proceedings may appeal by filing a lawsuit in state or federal court.   *R.L.*, 757 F.3d at 1178 (citing 20 U.S.C. § 1415(i)(2)(A)).  A district court has "broad discretion to fashion whatever relief is 'appropriate' in light of the IDEA's purpose." *R.L.*, 757 F.3d at 1178 (citing *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369, (1985)).

"In addition to the IDEA, parents of children with disabilities often invoke two federal antidiscrimination statutes in the course of disputes about whether a school district has satisfied its obligations under the IDEA: § 504 of the Rehabilitation Act, which prohibits federally funded programs from discriminating on the basis of a disability; and Title II of the ADA, which applies the same prohibition to public entities." *Dunbrow v. Cobb Cnty Sch. Dist.*, 887 F.3d 1182 (11th Cir. 2018).  Section 504 of the Rehabilitation Act and Title II of the ADA apply to all students, not just those who meet the IDEA's definition of child with a

---

used illegal drugs at school or on school premises, or "inflicted serious bodily injury upon another person" at school or on school premises.  20 U.S.C. § 1415(k)(1)(G).

disability.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, § 504 states that "[n]o otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.

## II.

Two standards of review apply in this case, one for Ms. Dowling's IDEA claim and one for her claims under the Rehabilitation Act and the ADA.  Under the IDEA, a district court "reviews the evidence presented to the ALJ."  *R.L.*, 757 F.3d at 1178.  Upon request of a party, a district court may receive additional evidence to supplement the administrative record.  20 U.S.C. § 1415(i)(2)(C)(ii); *R.L.*, 757 F.3d at 1178.

After reviewing the evidence in the administrative record and additional evidence that the district court accepts from the parties, the district court must "base its decision on a preponderance of the evidence and [] 'grant such relief as the court determines is appropriate.'"  *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1280

(11th Cir. 2008) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)). "When weighing the evidence, the District Court gives 'due weight' to the ALJ decision, and 'must be careful not to substitute its judgment for that of the state educational authorities.'" *R.L.*, 757 F.3d at 1178 (quoting *Walker Cnty. Sch. Dist. v. Bennett,* 203 F.3d 1293, 1297 (11th Cir. 2000)); *see also Rowley*, 458 U.S. at 206 (stating that the "provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"). A district court may "accept the ALJ's conclusions that are supported by the record and reject those that are not." *R.L.*, 757 F.3d at 1178 (citing *Loren F.*, 349 F.3d at 1314). When a district court rejects a hearing officer's conclusions, the district court must explain why. *R.L.*, 757 F.3d at 1178 (citing *Loren F.*, 349 F.3d at 1314 n. 5).[2]

---

[2] In *Walker Cnty. Sch. Dist. v. Bennett*, the Eleventh Circuit explained that the standard that governs a district court's review of an administrative decision under the IDEA is unique. The Eleventh Circuit wrote:

> Ordinarily, one expects judicial review of an administrative decision to be limited to the record before the administrative body, and for the court to be required to affirm if substantial evidence in the record supports the administrative determination. *See Capistrano Unified School District v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995). But the IDEA provision for judicial review has been described as "puzzling" (*id.* at 898) and "somewhat confusing." *Jefferson County Board of Education v. Alabama Department of Education,* 853 F.2d 853, 856 (11th Cir.1988), because it differs from the norm in a way that produces three distinct issues: (1) How much deference, if any, should be given to the administrative decision if additional evidence may be taken and the standard to be applied is the preponderance of the evidence? (2) What standard should be applied in deciding what "additional" evidence, if any, should be admitted in the district court proceeding? And (3) What is the appropriate procedural mechanism to be

When a hearing officer receives testimony during an administrative hearing and makes credibility determinations, a district court must defer to the hearing officer's findings "unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 528 (3d Cir. 1995) (citing *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991)); *see also D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) ("[W]hen, as here, an ALJ has heard live testimony and determined that one witness is more credible than another witness, her determination is due special weight."); *R.D. ex rel. Kareem v. District of Columbia*, 374 F. Supp. 2d 84, 89–90 (D.D.C. 2005) ("Where the Hearing Officer's findings are based on

---

implemented in the district court in bringing the case before the court for a final decision?

The first of these issues was the focus of the Supreme Court's decision in *Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), and has since received the attention of this Court in *Jefferson County Board of Education v. Alabama Department of Education,* 853 F.2d 853 (11th Cir.1988), and *Doe v. Alabama Department of Education,* 915 F.2d 651 (11th Cir.1990). Essentially, the law is established by *Rowley* that the administrative decision in an IDEA case is entitled to due weight and the court must be careful not to substitute its judgment for that of the state educational authorities.

*Bennett*, 203 F.3d at 1297-98 (footnotes omitted). The Sixth Circuit calls this the "modified *de novo*" standard of review. *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 609 (6th Cir. 2006) (explaining that under "'a modified de novo standard of review, a district court is required to make findings of fact based upon a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings, particularly when educational expertise is essential to the findings.'") (quoting *N.L. ex rel. Ms. C. v. Knox Cnty. Sch.*, 315 F.3d 688, 692 (6th Cir. 2003)).

credibility determinations of live witness testimony, as they were here, and there is no supplementation of the record before the Court, particular deference is due to the Hearing Officer's decision.").

The Court reviews Ms. Dowling's ADA and Rehabilitation Act claims under Rule 56 of the Federal Rules of Civil Procedure to determine whether disputed questions of fact require a trial on those claims. Pursuant to Rule 56, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a motion under Rule 56, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020). Accordingly, to evaluate Ms. Dowling's § 504 and ADA claims,

the Court will view the evidence in the light most favorable to Ms. Dowling and draw all reasonable inferences from the evidence in her favor.

## III.

The evidence demonstrates that R.E. was born on July 2, 1999.  (Doc. 30-7, p. 1).  R.E. attended elementary school in the Madison County School District.  (Doc. 30-7, p. 1).  By first grade, R.E.'s "speech [was] not where it should be[,]" and his speech "effect[ed] his reading."  (Doc. 30-7, p. 1).  In 2005, Ms. Dowling consented to a special education evaluation for R.E.  (Doc. 30-7, p. 5).  His eligibility committee included Ms. Dowling, his classroom teacher, a speech and language pathologist, and a local educational agency—LEA—representative.  (Doc. 30-7, pp. 10-13).  Because R.E.'s speech and language skills were not consistent with his age, his special education teacher referred him for a vision, hearing, and speech/language evaluation.  (Doc. 30-7, p. 5).  R.E. passed his vision exam and scored 96, 80, and 92 on his speech and language evaluations.  (Doc. 30-7, pp. 10-11).  Consequently, R.E. did not meet state guidelines to qualify for speech or language services.  (Doc. 30-7, p. 13).

R.E.'s teacher completed a "Student Prereferral Form" which documented the severity and duration of R.E.'s educational challenges.  (Doc. 30-7, pp. 7-9).  R.E.'s assessments in reading and language were very low; he had received zero points on a vocabulary test, and he had answered correctly 5% of the questions on a reading

test.  His math assessments were low too.  (Doc. 30-7, p. 7).  R.E. had failing grades in all subject areas, and he was below grade level in reading, language, and math.  (Doc. 30-7, pp. 7-8).  R.E. was on medication for ADHD, and his behavior depended upon his medication compliance.  (Doc. 30-7, p. 7).  R.E.'s teacher created an intervention plan that included fewer assignments, one-on-one classroom work, extra tutoring after school, and peer tutoring.  (Doc. 30-7, p. 8).  R.E.'s teacher monitored his progress under the intervention plan for 35 school days, using DIBELS to assess his progress.  (Doc. 30-7, pp. 8-9).[3]  By December 6, 2005, R.E. had achieved "[l]ittle change."  (Doc. 30-7, pp. 8-9).

In February 2006, R.E. was "performing below grade level in all subject areas, except for math."  (Doc. 30-8, p. 1).  He had "extreme mood swings" and "difficulty staying on task."  (Doc. 30-8, p. 1).  In April 2006, R.E.'s eligibility committee met and considered R.E.'s FSIQ score of 81 and other assessment tool scores.  (Doc. 30-8, p. 4).  The committee also considered observational assessments that indicated that R.E. could not count money or write sentences without help, and he had measurable anxiety, attention deficits, and aggression.  (Doc. 30-8, p. 5).  The committee determined that R.E. was eligible for special education services and

---

[3] Dynamic Indicators of Basic Early Literacy Skills or DIBELS "is a set of procedures and measures for assessing the acquisition of early literacy skills."   *What is DIBELS?* Univ. Oregon, https://dibels.uoregon.edu/about-dibels (last visited Nov. 30, 2022).

identified his primary "area of disability" as "Specific Learning Disabilities." (Doc. 30-8, p. 8).[4]  On April 20, 2006, Ms. Dowling gave permission for the school to provide special education services to R.E. (Doc. 30-8, p. 10).

In early 2009, when R.E. was in fourth grade, he transferred to the Athens City School District. (Doc. 30-9, p. 4).  In the spring of 2009, when it was time for R.E.'s three-year evaluation, his IEP team requested vision, hearing, intellectual, achievement, and behavior assessments and observations, grades, work samples, attendance reports, ADD Scales, and an ECE checklist. (Doc. 30-9, p. 2).  Ms. Dowling consented to the reevaluation. (Doc. 30-9, pp. 1, 3, 5).  R.E.'s IEP team decided that he remained eligible for special education services under "Specific Learning Disabilities" because of the severe discrepancy between his ability and achievement. (Doc. 30-9, p. 9).  For example, he was reading 14 words per minute; his benchmark was 92 words per minute. (Doc. 30-9, p. 6).  His intelligence assessment scores were high. (Doc. 30-9, p. 6).

---

[4] Alabama's Administrative Code defines "Specific Learning Disabilities" as:

> a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

ALA. ADMIN. CODE r. 290-8-.03(10)(a).

14

R.E. attended Athens Intermediate School during the 2010-11 school year.

R.E.'s IEP team met for his annual IEP review in April 2011. (Doc. 30-10, p. 3). In

his student profile, the team wrote:

> [R.E] is an eleven-year old fifth grader who will be entering sixth grade
> in August 2011. [R.E.] lives with his mom and two older siblings.
> [R.E.] is athletic and enjoys sports, especially basketball, in his free
> time. He also like[s] to play computer games. [R.E.]'s mother has been
> helpful this year in making sure he has his medication each day and
> communicating with the teachers regarding [R.E.]'s problems with
> anger management.
>
> [R.E.] had a difficult year during fifth grade. He had numerous
> disciplinary referrals first semester which resulted in a short stay in
> Eagle Academy. However, [R.E.] quickly learned to meet the
> requirements there and returned to AIS after about six weeks. [R.E.]
> takes medication for ADHD and without it, he has great difficulty
> controlling his impulses. [R.E.] has a very 'short fuse' and tends to
> react quickly without thinking of the consequences of his actions.
> However, [R.E.] has a sweet disposition and can be extremely helpful
> and polite. He enjoys helping younger students, especially in math, and
> has very good general knowledge. He has good manners and, with his
> medication, can be a model student.

(Doc. 30-10, p. 3). The team stated that R.E. had "a history of reading difficulty"

and that, despite progress, he still was at grade level 2.4 in reading comprehension.

(Doc. 30-10, p. 3).

The team proposed annual goals in math and reading. (Doc. 30-10, pp. 4-8).

The team decided that it needed new assessments in the areas of vision, hearing,

intellectual, achievement, behavior, and speech because R.E.'s scores were outdated.

(Doc. 30-10, p. 28). Ms. Dowling received a copy of the 2011-12 IEP, a Special

Education Rights document, and notice of the team's decision regarding reevaluation on April 29, 2011.  (Doc. 30-10, pp. 9, 27-28).

Shortly after the 2011-12 school year began, after receiving a call from Ms. Dowling concerning R.E.'s behavior, R.E.'s IEP team amended his 2011-12 IEP. R.E.'s IEP team created a positive behavior plan.  (Doc. 30-11, p. 2).  The team determined that R.E.'s behavior impeded his learning or the learning of others.  (Doc. 30-11, p. 3).  The team commented that "[w]hen everything is fine with R.E. he behaves beautifully and is well-mannered.  R.E. gets mad when he is corrected or doesn't get his way.  He responds by talking back, mumbling, slinging his books around, and being generally disrespectful."  (Doc. 30-11, p. 5).  The team decided that R.E. should have a 90% daily success rate on a behavior chart that he had to carry from class to class.  (Doc. 30-11, p. 5).  Ms. Dowling attended the meeting and signed the IEP.  (Doc. 30-11, p. 9).

Before the 2011-12 school year ended, R.E. transferred to the Limestone County School District.  R.E.'s Limestone County IEP team conducted assessments and observations and collected work samples for R.E.'s three-year reevaluation. (Doc. 30-12).  R.E. took the Weschler Individual Achievement Test – Third Edition (WIAT-III) and the Reynolds Intellectual Assessment Scales (RIAS).  (Doc. 30-12,

p. 3).[5]   R.E.'s IEP team adopted the April 2012 results of R.E.'s behavior assessments from the Athens school district—the Adaptive Behavior Evaluation Scale-R2 (School Version) and the Behavior Evaluation Scale Third Edition-School (BES-3).   (Doc. 30-12, p. 4).[6]   Members of R.E.'s Limestone County IEP team observed him in the classroom and completed his evaluations.  (Doc. 30-12, pp. 4-

---

[5] The WIAT-III "is a standardized academic achievement test used to measure previously learned knowledge in the areas of Reading, Written language, Mathematics, and Oral Language." *Wechsler Individual Achievement Test-III*, NINDS (July 2018), https://www.commondataelements.ninds.nih.gov/report-viewer/24330.

The Reynolds Intellectual Assessment Scales is an intelligence test used to measure verbal and non-verbal intelligence and memory.  "[S]cores between 85 and 115 are considered average[.]" *Reynolds Intellectual Assessment Scales*, IQ TEST PREP, https://iqtestprep.com/reynolds-intellectual-assessment-scales/ (last visited Nov. 30, 2022).

[6] "The *Adaptive Behavior Evaluation Scale-Revised Second Edition* (ABES-R2) provides a measure of adaptive behaviors necessary for success in the educational and residential settings that are not measured by academic skills testing.  The ABES-R2 meets the need for an adaptive behavior rating scale which relies on direct behavioral observations by educators and parents/guardians in educational and residential settings.  The ABES-R2 is used as a measure of adaptive skills in the identification of intellectually disabled, behaviorally disordered, learning disabled; and visually, hearing, or physically impaired students." (84 words) Tamara J. Arthaud & Stephen B. McCarney, *ADAPTIVE BEHAVIOR EVALUATION SCALE REVISED SECOND EDITION (ABES-R2)*, HAWTHORNE EDUC. SERVS., https://www.hawthorne-ed.com/pages/adaptive%20behavior/ab1old.html (last visited Nov. 30, 2022) (emphasis in original).

The BES-3 Long "was developed to aid in diagnosis, placement, and planning for behaviorally disordered/emotionally disturbed children and youth.  The scale consists of 76 items (school) and 73 items (home), each associated with one of the five characteristics of the definition of behavioral disorders/emotional disturbance included in the Individuals with Disabilities Education Act (IDEA) (PL 101-476) and most state regulations." (57 words) TAMARA J. ARTHAUD & STEPHEN B. MCCARNEY, BEHAVIOR EVALUATION SCALE - THIRD EDITION: LONG (BES-3: L) (2005), https://www.hawthorne-ed.com/images/behavior/samples/swf%20files/h03050sb.pdf.

The BES-3 Short consists of 54 school items and has the same goals as the BES-3 Long. TAMARA J. ARTHAUD & STEPHEN B. MCCARNEY, BEHAVIOR EVALUATION SCALE - THIRD EDITION: SHORT (BES-3: S) (2005), https://pdf4pro.com/view/behavior-evaluation-scale-third-edition-short-1048a4.html.

17

5).  On May 29, 2012, the district gave Ms. Dowling notice of an IEP team meeting scheduled for June 12, 2012 to discuss R.E.'s reevaluation and to develop his annual IEP.  (Doc. 30-12, p. 1).  Ms. Dowling indicated that she would not be able to attend the meeting.  Ms. Dowling did not exercise her option to ask the other members of R.E.'s IEP team to reschedule the meeting; she indicated that she would contact the team if she wanted more information.  (Doc. 30-12, p. 1).

At the June 12, 2012 meeting, the team evaluated the assessments conducted by the Athens school district and the assessments, observations, and work samples from Limestone County.  R.E.'s achievement scores indicated that in comparison to other children his age, R.E. had average functioning in math; below average functioning in oral language, reading, and written expression; and low functioning in reading comprehension and fluency.  (Doc. 30-12, p. 3).  R.E. had a severe discrepancy between his ability and achievement with a standard deviation of 16 points.  (Doc. 30-12, p. 6).  R.E.'s behavior evaluation scale scores "[were] in the average range, indicating no behavior concerns affecting [R.E.]'s academic functioning."  (Doc. 30-12, p. 4).  R.E.'s Adaptive Behavior Evaluation Scale scores "[were] in the range considered as 'average[,]' indicating no adaptive skills of concern."  (Doc. 30-12, p. 4).  During classroom observation, "[n]o disruptive behaviors were observed," and R.E. appeared to behave "'better' than most of the other students in the classroom."  (Doc. 30-12, p. 4).

R.E.'s IEP team ruled out "Environmental/Cultural/Economic Concerns," Visual/Hearing Disabilities," "Mental Retardation," "Emotional Disturbance," and "Motor Disabilities" as the primary cause of R.E.'s impairments. (Doc. 30-12, p. 6). The committee indicated that the "[r]esults of [R.E.]'s behavior rating scales and other data gathered revealed no behaviors that would affect his academic functioning." (Doc. 30-12, p. 6). The committee determined that R.E. was eligible for special education under the designation "Specific Learning Disability." (Doc. 30-12, p. 7).[7]

R.E.'s IEP team conducted his IEP meeting for the 2013-14 school year on May 15, 2013. The IEP team noted that R.E. had had a behavior intervention plan during the 2012-2013 school year and that the team wanted R.E. to continue the plan for the upcoming school year. The team wrote:

> [R.E.] has had several behavioral issues ranging from fighting, cussing, and [being] disrespectful, hitting, and choking another student. [R.E.] has an A[lternative] school referral. He was referred for 15 days. After [R.E.]'s 15 days at A[lternative] School, [R.E.] returned to Elkmont. [R.E.] has had 0 office referrals. [R.E.] is currently taking medication for ADHD and anxiety. [R.E.] is also seeing a Mental Health Counselor up to 3 times a month. Due to the new medication and seeing a Mental Health Counselor, [R.E.] has made progress with his behavior. [R.E.] also has the diagnose [*sic*] of dyslexia[.]

(Doc. 30-13, p. 2). The team wrote that R.E.'s behavior would "continue to impact his progress in the general education curriculum." (Doc. 30-13, p. 6). The team

---

[7] The Court has not located R.E.'s 2012-2013 IEP in the record.

assigned R.E. a goal of using positive self-regulation and self-control in all school settings daily by the end of the school year.  To determine if R.E. had mastered the goal, the team decided it would evaluate office referrals and teacher observations. (Doc. 30-13, p. 6).  Ms. Dowling approved the IEP.  (Doc. 30-13, p. 11).

R.E. began the 2013-14 school year at Elkmont.  Following a disciplinary suspension, Ms. Dowling withdrew R.E. from Elkmont and home-schooled him for the balance of the 2013-14 school year.  (Doc. 30-1, p. 110; Doc. 30-6; Doc. 30-14, p. 5).  In the spring of 2014, R.E.'s IEP team developed his IEP for the 2014-15 school year.  The team planned to monitor R.E.'s behavior during the 2014-15 school year and offer him opportunities to talk to the school counselor when he felt overwhelmed.  (Doc. 30-14, pp. 4, 8).  His case manager was to meet with him every one or two weeks to check on his progress.  (Doc. 30-14, pp. 4, 8).  The team indicated that R.E.'s behavior impeded his learning or the learning of other students. (Doc. 30-14, p. 6).  R.E. was reading at a third-grade level.  (Doc. 30-14, pp. 4, 10). His math scores were at a sixth-grade level.  (Doc. 30-14, pp. 4, 9).

On September 3, 2014, R.E.'s psychiatrist, Dr. J. Mark Kirk, sent a letter to Limestone County School Superintendent Dr. Tom Sisk.  (Doc. 30-6, pp. 1-2).  Dr. Kirk explained that he had treated R.E. for three years.  (Doc. 30-6, p. 1).  Dr. Kirk wrote the letter to "support[] [R.E.'s] placement at a different school due to the difficulties that he experienced at his current school . . . i.e., the Elkmont School."

(Doc. 30-6, p. 1).  R.E. had reported "difficulties with sleep, with appetite, [and] withdrawal from others and this became much more prominent after he was suspended from school in the September 2013 timeframe secondary to an altercation with another peer."  (Doc. 30-6, p. 1).[8]  R.E. reported "significant difficulties interacting in that academic environment."  (Doc. 30-6, p. 1).  Dr. Kirk diagnosed R.E. with "Attention Deficit Hyperactivity Disorder, Combined Type; Oppositional Defiant Disorder; Learning Disorder NOS; and Adjustment Disorder with Mixed Anxiety and Depressed Mood, chronic."  (Doc. 30-6, p. 2).[9]  R.E.'s mother was concerned about a possible return to Elkmont after one year of home-schooling.

---

[8] The details of the September 2013 suspension are not in the administrative record.

[9] ADHD, combined type is "the most common type of ADHD, [] characterized by impulsive and hyperactive behaviors as well as inattention and distractibility."  *Attention-Deficit/Hyperactivity Disorder (ADHD) in Children*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/adhdadd (last visited Nov. 30, 2022).

"Oppositional defiant disorder (ODD) is a type of behavior disorder.  It is mostly diagnosed in childhood.  Children with ODD are uncooperative, defiant, and hostile toward peers, parents, teachers, and other authority figures.  They are more troubling to others than they are to themselves. . . . Many children tend to disobey, argue with parents, or defy authority. . . . They also interfere with learning and school adjustment."  *Oppositional Defiant Disorder (ODD) in Children*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/oppositional-defiant-disorder (last visited Nov. 30, 2022).

"An adjustment disorder is an emotional or behavioral reaction to a stressful event or change in a person's life.  The reaction is considered an unhealthy or excessive response to the event or change within three months of it happening.  Stressful events or changes in the life of [a] child or adolescent may be a family move, the parents' divorce or separation, the loss of a pet, or the birth of a sibling.  A sudden illness or restriction to [a] child's life due to chronic illness may also result in an adjustment response."  *Adjustment Disorders*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/adjustment-disorders (last visited Nov. 30, 2022).

(Doc. 30-6, p. 1). The district gave R.E. a waiver and moved him to Tanner High School. (Doc. 30-1, p. 110).

On September 30, 2014, R.E.'s IEP team notified Ms. Dowling of a team meeting at Tanner High School. (Doc. 30-14, p. 1). At the meeting, R.E.'s IEP team determined that he "continue[d] to qualify for special education services under the code of Specific Learning Disabilities." The team rejected "[t]he option of eligibility under another category such as Other Health Impaired," because "testing scales [did] not indicat[e] any concerns in this area." (Doc. 30-41).

R.E.'s IEP team met twice more before the end of the 2014-15 school year. (Doc. 30-1, p. 14). In February of 2015, after R.E. received a recommendation for placement at Limestone County's Alternative School for 21 days for disciplinary infractions, R.E.'s IEP team met to consider whether the alleged infractions were a manifestation of his disability. (Doc. 30-14, pp. 14-17; Doc. 30-42). R.E. had had nine office referrals for "defiance, disruption, profanity, disrespect, and cell phone violations." (Doc. 30-14, p. 14). R.E. was receiving "weekly instruction for positive behavior support." (Doc. 30-14, p. 14). The team noted that R.E. was receiving "outside mental health services," and he was taking medication daily for ADHD and sleep. (Doc. 30-14, pp. 14, 20). Based on a functional behavior assessment, the team determined that R.E. could "control his behavior for the discipline infractions discussed" and that "peer attention, power control, and avoidance" were the reasons

22

for R.E.'s behavior.  (Doc. 30-14, p. 14; Doc. 30-42, p. 1).[10]  The team amended R.E.'s IEP to include this information and to include services for weekly behavior counseling.  (Doc. 30-14, pp. 18-28).  R.E.'s special education teacher was to "provide small group instruction to target defiant and disruptive behavior using positive behavior incentives, social skills instruction, collaboration with behavior counselor, and daily goal setting."  (Doc. 30-14, pp. 26, 27).  The IEP stated that R.E. "required computer based instruction for grade level standards and intervention to increase task completion, time on task, and positive behaviors."  (Doc. 30-14, p. 27).  The IEP team and Ms. Dowling agreed that R.E. would be placed at the Alternative School for 21 school days.  (Doc. 30-42).

On April 6, 2015, the IEP team met to review discipline infractions that occurred while R.E. attended the Alternative School.  The team stated:

> [R.E.] had significant deaths in his family from March 18 through March 23- his dad passed suddenly on March 23.  Based on the data from [the functional behavior assessment], [R.E.] exhibits defiance/disruption/disrespect on daily basis throughout the day, but more frequent in the morning till [sic] around 11AM each day.  [R.E.] chews food and spits it in the floor, chews forks and keeps in mouth,

---

[10] At the administrative hearing before the IHO, Tara Bachus, Limestone County's Director of Special Education, testified that when an IEP team conducts a functional behavior assessment, the team "look[s] at behavior that occurs in the school setting; what is triggering that behavior, what happens during the behavior, and what happens afterwards," so the team may "write a plan to change the behavior."  (Doc. 30-1, p. 103).

The Court has not found in the record a functional behavior assessment dated February 2015.  (*See* Doc. 30-58, pp. 13-16 for an example of a Functional Behavior Assessment form).  Based on language in the amendment to R.E.'s 2014-15 IEP, it appears his IEP team may have relied on a functional behavior assessment from the 2012-13 school year.  (*See, e.g.*, Doc. 30-14, pp. 18, 24).

refuses to complete work even with one to one support and continuous prompting, unplugs all the computers in the room, repeatedly up and down out of seat, loudly blurts out what he is and isn't going to do, crawls on floor and eats bits of paper picked up from floor, uses sexually inappropriate gestures with hands and body parts, lays in the floor while laughing out load [*sic*], refuses to follow teacher and administrative directives. [R.E.] sleeps and is difficult to wake up. [R.E.] was assigned an additional 60 days of A[lternative] school for repeated Class II behaviors and continued to exhibit adverse behaviors. Mom indicated is currently on daily medication for ADHD- Intuniv, but stated that she has requested a change in medication, but outside mental health providers can not change the medication until [R.E.] has a clean drug screening. [R.E.] is currently enrolled in outpatient drug rehab program and is on juvenile probation with the Limestone County probation office. Mom stated that unusual and adverse behaviors have increased in frequency and severity at home as well as school.

(Doc. 30-14, p. 5; Doc. 30-44, p. 1).

The IEP team determined that R.E. "would benefit from an environment that reduced opportunities to gain attention by exhibiting adverse behaviors" and referred R.E. to the Limestone County Multi-Needs team "for possible support from additional outside agencies to better manage student behaviors to help increase academic progress and successful school participation." (Doc. 30-14, p. 5).[11] The IEP team added weekly homebound services for academics, using instruction from a special education teacher and "HQ computer based learning program; counseling services from the district's behavior counselor "in an alternate setting" for anxiety, defiant, and disruptive behaviors; and skills intervention services. (Doc. 30-14, pp.

---

[11] R.E. was approved for state level multi-needs team. That team was to determine R.E.'s eligibility for residential placement. (Doc. 30-69, p. 4).

24

5, 11).  R.E.'s LRE designation changed to an "alternate setting due to repeated defiant/disruptive behaviors which impede the learning of himself and others." (Doc. 30-14, p. 13).  Ms. Dowling was given a copy of the Special Education Rights document at the meeting, and she received a copy of the amended IEP on April 15, 2015.  (Doc. 30-14, p. 13).  The team indicated that it would reconvene at the end of May "to determine IEP services and LRE for the 2015-16 school year and review student progress."  (Doc. 30-14, p. 5).

In May 2015, Ms. Dowling admitted R.E. to The Bridge, a residential drug treatment facility in Gadsden, Alabama.  (Doc. 30-15, p. 7).[12]  On May 21, 2015, an IEP team at the Bridge conducted R.E.'s triennial evaluation and developed R.E.'s IEP for the 2015-16 school year.  (Doc. 30-1, pp. 20, 23-24; Doc. 30-15).  Ms. Dowling attended the meeting by telephone, and R.E. attended the meeting in person.  (Doc. 30-15, pp. 14, 57).  The Bridge IEP team had given R.E. the TABE and the WIAT.  (Doc. 30-15, pp. 1, 17-21).  The team also had interviewed R.E. and Ms. Dowling and conducted an interest inventory, Casey Life Skills Survey, and Multiple Intelligence Survey with R.E.  (Doc. 30-15, pp. 4, 26-51, 53).  With these evaluations and data from 2012 and 2015, the Bridge IEP team believed it had sufficient information to conduct R.E.'s reevaluation and determine his eligibility

---

[12] Gadsden is in Etowah County, Alabama.

status.  (Doc. 30-15, pp. 52-55).

For R.E.'s reevaluation, the Bridge IEP team determined that R.E. continued to qualify for special education services based on a Specific Learning Disability. (Doc. 30-15, p. 57).  Referring to R.E.'s 2015-16 IEP, the team documented that R.E. had ADHD and that he was taking Trazodone and Abilify.[13]  The team wrote that "[r]esults of behavior ratings scales and other data gathered revealed no behaviors that would affect [R.E.'s] academic functioning."  (Doc. 30-15, p. 56).

For his 2015-16 IEP, the Bridge IEP team relied on R.E.'s May 2015 assessments and on past test scores.  (Doc. 30-15, pp. 1-2, 4).  Academically, the team set occupational, reading, comprehension, and math goals for R.E.  (Doc. 30-15, pp. 5-6, 8-11).  The team indicated that R.E. did not have a behavior that impeded his learning or the learning of others.  (Doc. 30-15, p. 3).  The team stated that while he participated in The Bridge program, R.E. would receive one-on-one counseling and group therapy to address issues at his home school with fighting, cursing, and disrespect.  (Doc. 30-15, pp. 1, 7).  The team stated that R.E. had "good social skills" and that his behavior had improved since his arrival at The Bridge.  (Doc. 30-15, p.

---

[13] Trazodone and Abilify are prescribed to treat depression.  *Trazodone*, MEDLINEPLUS (Jan. 15, 2022), https://medlineplus.gov/druginfo/meds/a681038.html#:~:text; *Abilify - Uses, Side Effects, and More*, WEBMD, https://www.webmd.com/drugs/2/drug-64439/abilify-oral/details (last visited Nov. 30, 2022).

1).  The team wrote that when R.E. returned to his "base school," the school would have to monitor his behavior and write a behavior plan.  (Doc. 30-15, p. 7).  His special education teacher was to provide at least 30 minutes of counseling each week in behavior interventions.  (Doc. 30-15, p. 12).  His behavior goal was no more than one office referral for each grading period for a maximum of four referrals for the school year.  (Doc. 30-15, p. 7).[14]  R.E.'s Bridge IEP states that he would not receive all special education services with his non-disabled peers because he "need[ed] the support of the resource setting to remediate deficits."  (Doc. 30-15, p. 14).

R.E. reenrolled in the Limestone County school district in August 2015.  (Doc. 30-1, p. 24).  R.E. enrolled at East Limestone High School, the third high school he attended in the district.  (Doc. 30-1, p. 110).  R.E.'s IEP team at East Limestone County High adopted the Bridge IEP team's Specific Learning Disability eligibility reevaluation determination and implemented R.E.'s 2015-16 IEP from the Bridge.  (Doc. 30-1, p. 24; Doc. 30-47).  On August 31, 2015, Tara Bachus, the Director of Special Education for the Limestone County School district, provided Ms. Dowling written notice that R.E.'s Limestone County IEP team had met and planned, in 10 days, to amend R.E.'s 2015-16 IEP to reflect that he had a behavior that impeded his learning or the learning of others, to add services from a behavior teacher for 30

---

[14] At the administrative hearing, Ms. Bachus testified incorrectly that the Bridge team's IEP for R.E. "didn't indicate he needed a behavior plan[] [or] a behavior goal."  (Doc. 30-1, p. 24).

minutes two times each week, and to "address the appropriate times the behavior teacher will provide intervention for [R.E.]."  (Doc. 30-48, pp. 1, 3-4; *see also* Doc. 30-54, p. 2).

In September 2015, R.E. "stated that he needed to purchase a gun after talking with [a teacher] concerning his defiance."  (Doc. 30-52, p. 1).  The matter was referred to the Board's disciplinary placement committee.  On September 28, 2015, R.E.'s IEP team conducted an MDR to examine whether the alleged disciplinary infraction was related to R.E.'s primary disability.  (Doc. 30-51).  The team pointed out that R.E.'s "disability [was] Specific Learning Disability (SLD)" and that R.E. "see's [*sic*] the behavior teacher" to address behavioral issues and "collaborate[s] with the special education teacher."  (Doc. 30-51, p. 1). Ms. Dowling informed the team that R.E. was "going through changes in medication" and that R.E.'s mental health provider was evaluating him for mood disorders.  Ms. Dowling stated that R.E. had run away over the weekend and that she had filed a missing person's report.  (Doc. 30-51, p. 1).  At the time of the meeting, R.E. had failing grades, and he had been suspended for a total of five days.  (Doc. 30-51, p. 1).  R.E. had infractions for a cell phone violation, slapping another student during class, not bringing books to class, revealing his nipple, showing disrespect when corrected, playing inappropriate video games in class, and refusing to surrender his device and take his seat.  (Doc. 30-54, pp. 2-3).  The IEP team concluded that R.E.'s conduct was not caused by and

did not have a direct and substantial relationship to his disability.  (Doc. 30-51, p. 1).  Consequently, the Board was to "continue to make a free appropriate public education (FAPE) available to [R.E.] in a manner which enabled[d] [him] to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in [his] IEP."  (Doc. 30-51, p. 2).

The Board sent Ms. Dowling a letter dated September 29, 2015, notifying her that the Board's Disciplinary Placement Committee had scheduled a due process hearing at 8:30 a.m. on October 1, 2015, to determine whether R.E. would face expulsion for his gun comment.  (Doc. 30-52, p. 1).  On October 1, 2015, the committee decided to place R.E. in the district's Alternative School for 15 school days beginning on October 5, 2015.  The Disciplinary Placement Committee noted that after R.E.'s Alternative School period, "placement at Colt Academy [would] be considered."  (Doc. 30-52, p. 3).  The Board notified Ms. Dowling of the Alternative School placement and of her right to appeal the decision if she felt R.E.'s assignment to the school was unjustified.  The Board provided contact information for filing an appeal.  (Doc. 30-52, p. 3).

On October 5, 2015, Ms. Bachus provided Ms. Dowling written notice that R.E.'s LCHS IEP team had met to discuss the Disciplinary Placement Committee's decision.  (Doc. 30-53).  The team considered observations of R.E. and R.E.'s

grades, behavior, and discipline records. (Doc. 30-53). The team decided "to place [R.E.] in alternative school due to behavior concerns and disciplinary infractions/threats." (Doc. 30-53). The team considered keeping R.E. at East Limestone High School, but the team rejected the option based on the disciplinary hearing decision to place R.E. in the district's Alternative School. (Doc. 30-53; *See* Doc. 30-54, p. 3). The team indicated that it would delay R.E.'s placement at the Alternative School for 10 calendar days to give Ms. Dowling "a reasonable period of time to consider the proposed action." (Doc. 30-53).[15]

R.E.'s IEP team met on October 8, 2015 to discuss R.E.'s failure to meet the behavior goal in his IEP. (Doc. 30-54, p. 3). The team stated that a new behavior goal would be implemented for R.E., and his behavior teacher would monitor his office referrals and collaborate with his academic teachers. (Doc. 30-54, p. 3; *see generally* Doc. 30-1, p. 255). The team discussed with Ms. Dowling whether Colt Academy might provide better support for R.E. and serve as his least restrictive environment after he completed his 15 days at the Alternative School. (Doc. 30-1, pp. 39-41, 229).[16]

R.E.'s IEP team met on November 6, 2015, to decide whether he should return

---

[15] It appears that R.E. began his 15-day term at the Alternative School immediately because he completed the term on October 23, 2015. (Doc. 30-1, p. 229).

[16] At the administrative hearing, Ms. Bachus explained that Colt Academy is "a positive behavior support program" developed by a board-certified behavior analyst. (Doc. 30-1, p. 37).

to East Limestone High School when he completed his 15-day placement at the Alternative School.  Ms. Dowling was not able to attend the meeting, but she gave permission for the team to proceed.  (Doc. 30-54, p. 3).  R.E.'s IEP team "decided that Colt Academy [was] the best school placement for [R.E.] due to [R.E.'s] disciplinary infractions which lead to [R.E.'s] many school placements."  (Doc. 30-54, p. 3).  R.E. attended Colt Academy for four school weeks, beginning in November of 2015.  (Doc. 30-1, pp. 60, 63).  While there, R.E. used the "Edgenuity" computer program to complete core coursework.  (Doc. 30-1, pp. 60-62).[17]

In January 2016, R.E. was taken into the custody of the Alabama Department of Youth Services.  R.E. was enrolled at the Adele Goodwyn McNeel School in Birmingham, Alabama.  (Doc. 30-1, pp. 63-64).  R.E. spent the remainder of the 2015-16 school year at the McNeel School.  (Doc. 30-1, pp. 64, 66).

In May 2016, R.E.'s IEP team at the McNeel School developed R.E.'s IEP for the 2016-17 school year.  (Doc. 30-55).  Ms. Dowling attended the IEP meeting.  (Doc. 30-55, p. 11).  Many of the McNeel team's observations about R.E. were consistent with the observations of the Bridge team.  In the narrative profile section of the IEP, the team wrote that R.E. was capable but easily distracted and needed

---

[17] "Edgenuity offers a full suite of K–12 online learning solutions for schools and districts that are backed by intuitive technology that gives educators the resources they need to plan lessons, execute goals, measure success, and intervene when necessary."  *Edgenuity*, KASA, https://www.edgenuity.com (last visited Nov. 30, 2022). (I had to change the website and find the quote somewhere else because the original website moved).

redirection.  (Doc. 30-55, p. 1).  The team stated:  "Care has to be taken because [R.E.] does try to convince staff that he is unable to complete certain assignments." (Doc. 30-55, p. 1).  The team explained that "[R.E.] would benefit from help in reading, math, and language arts.  Despite the altercations, the team [did] not feel that he [was] a behavior problem."  (Doc. 30-55, p. 1; *see also* Doc. 30-55, p. 3 (indicating that R.E. did not have a behavior that impacted his learning or the learning of other students).  R.E.'s McNeel IEP team acknowledged R.E.'s ADHD diagnosis and reported that R.E. was prescribed Depakote and Seroquel.  (Doc. 30-55, p. 2).  R.E.'s reading comprehension remained at a third-grade level.  (Doc. 30-55, p. 7).

R.E.'s McNeel IEP team completed a functional behavior assessment of R.E. based on observations and an interview with R.E.  The team explained that R.E. engaged in horseplay in class when he was around other students engaged in horseplay and that he misbehaved to get the attention of peers.  The team reported that R.E. responded positively to redirection, and the impact of the horseplay on his learning was "very minimal."  (Doc. 30-55, pp. 12-13).  The team stated that R.E. struggled with frustration.  (Doc. 30-55, p. 13).  R.E.'s IEP called for the same behavioral services that R.E.'s Limestone County IEP team designated when it amended R.E.'s 2015-16 IEP.  (Doc. 30-55, p. 9; *see* Doc. 30-54, p. 10).

After R.E. completed the 2015-16 school year at the McNeel School in Birmingham, Ms. Dowling attempted to enroll R.E. in the summer school program at Tanner High School.  (Doc. 30-1, p. 68).  Because of his placement at the McNeel School, R.E. no longer was enrolled as a student in the Limestone County school district.  (Doc. 30-1, p. 68).  Ms. Bachus explained to Ms. Dowling that she needed to reenroll R.E. in the Limestone County school system before R.E. could receive summer services from the district.  (Doc. 30-1, pp. 68-71).  Ms. Dowling enrolled R.E., and the district picked up where the McNeel School left off, providing a homebound teacher for one-on-one services through Edgenuity.  (Doc. 30-1, pp. 69, 71; Doc. 30-56, p. 1).

During a conference in June of 2016 at the Board's Central Office, Ms. Dowling, Ms. Bachus, and several other Board employees discussed the possibility of placing R.E. at the Board's Success Academy for the 2016-17 school year.  (Doc. 30-56, p. 1).  The program offered a four-hour school day.  The team completed an Alternative Learning Referral Information form and discussed a referral for R.E. to vocational rehabilitation.  (Doc. 30-56, p. 1).  The meeting was not an official IEP meeting because Ms. Dowling was in the process of re-enrolling R.E. in the Limestone County school district.  (Doc. 30-1, pp. 89-90).

On July 28, 2016, R.E.'s Limestone County IEP team met to review his McNeel-developed IEP for the 2016-17 school year.  (Doc. 30-1, p. 85).  R.E.'s

Limestone County IEP team adopted the McNeel 2016-17 IEP.  (Doc. 30-1, pp. 88-85).  The team did an LRE review and "went through a factors of consideration process."  (Doc. 30-1, p. 85; Doc, 30-57).  The team concluded that R.E. would receive instruction through the Success Academy program.  Success Academy is an 80-100 LRE; R.E. had an 80-100 LRE in the McNeel IEP for 2016-17.  (Doc. 30-1, pp. 86-88; *see* Doc. 30-55, p. 11).  The team coupled the Success Academy program with homebound services to allow R.E. to pursue credit recovery because Ms. Dowling had expressed concern about R.E.'s credits.  (Doc. 30-1, pp. 85, 88-89, 95).

On August 30, 2016, R.E.'s Limestone County IEP team met and amended his IEP to document his homebound services via Edgenuity.  (Doc. 30-58, pp. 2, 9; Doc. 30-58, p. 5 – *compare* Doc. 30-55, p. 5, Community Experiences transition activities).   The team also completed a functional behavior assessment and behavioral intervention plan for R.E. to address his defiance and refusal to complete his work.  (Doc. 30-1, p. 107; Doc. 30-58, pp. 13-16).  The team based its assessment on observations, teacher interviews, R.E.'s discipline reports, and his prior behavioral assessments.  (Doc. 30-58, p. 13).  The IEP team stated that "[R.E.] exhibit[ed] off task behaviors, not following directions, inappropriate behavior (laughing/talking to himself during class), and inappropriate sexual behaviors." (Doc. 30-58, p. 13).  The team wrote that R.E's "[b]ehaviors impact[ed] his academic learning and participation in his academic computer based program . . . and

impact[ed] his academic grade and ability to complete his course work." (Doc. 30-58, p. 13). The team added that "[w]hen [R.E.] exhibit[ed] inappropriate behaviors, he f[ell] further behind in academic courses. His inappropriate behavior negatively impact[ed] his education process and disrupt[ed] the education process of other students." (Doc. 30-58, p. 13). The team noted that R.E.'s behaviors occurred throughout the day, that the behaviors varied in length depending on R.E.'s mood, and that the behaviors occurred across all educational settings. (Doc. 30-58, p. 13). The team determined that R.E.'s behaviors occurred when R.E. was frustrated and wanted to avoid academic work or was faced with a task that he did not want to complete. (Doc. 30-58, pp. 13-14). Previous interventions included redirecting R.E., conferencing with him, working one-on-one with him, giving him verbal warnings, and removing him from class. (Doc. 30-58, p. 13). R.E. was to "receive positive reinforcement when controlling his frustration throughout the day," and he "[would] be allowed to express his frustration to his teacher, counselor, and/or school administrator as needed." (Doc. 30-58, p. 15).

On August 31, 2016, "[d]uring a homebound session, [R.E.] stood up, pulled his pants down, grabbed and lifted his penis exposing himself to the homebound teacher." (Doc. 30-60, p. 1). The homebound teacher called Ms. Dowling into the room to tell her what happened. (Doc. 30-60, p. 6). Ms. Dowling scolded R.E. and tried to call R.E.'s probation officer for help. (Doc. 30-60, p. 6). The homebound

teacher left R.E.'s home and filed a complaint for indecent exposure with the Limestone County Sheriff's Office.  (Doc. 30-60, p. 6).  The homebound teacher reported to the sheriff's office that R.E. had made inappropriate contact with her on another occasion; he had tried to place a blanket around her shoulders and hug her from behind.  (Doc. 30-60, p. 5).  Ms. Dowling took R.E. to Hill Crest Hospital where he was diagnosed with psychosis and suicidal ideations.  (Doc. 30-59, p. 15; Doc. 30-60, p. 1).

On September 22, 2016, R.E.'s IEP team notified Ms. Dowling that the team had scheduled a manifestation determination meeting for September 27, 2016.  (Doc. 30-59, p. 14).  R.E.'s IEP team met on September 27, 2016 to determine whether R.E.'s behavior with the homebound teacher was a manifestation of his disability. The team described the event, noting that "[p]rior to 8-31-16, [R.E.] was participating in Success Academy and grabbed his crotch in front of [an] instruction assistant on 8-19 and 8-22."  (Doc. 30-60, p. 1).  The team indicated that R.E.'s general education teachers "didn't notice sexual behaviors, but did observe [R.E.] randomly looking side to side and laughing out loud throughout academic sessions." (Doc. 30-60, p. 1).  Ms. Dowling stated that during the week of the incident, R.E. was talking to himself, not sleeping, and pacing the floor all night.  R.E. reported to the police that "he was living in a dream world." (Doc. 30-6, p. 1).  R.E.'s teacher

reported that R.E. required one-to-one instruction, and his medication compliance impacted his participation and behavior. (Doc. 30-59, p. 15).

The IEP team considered data in R.E.'s eligibility report, his functional behavior assessment, his discipline records, his attendance records, and input from Ms. Dowling. (Doc. 30-1, pp. 120-21; Doc. 30-60, p. 1). Because R.E. had never before had "a sexual aggression act" or "pulled down his pants and done those things" in the "school environment," the team determined that R.E.'s misconduct "was one offense that occurred in isolation" and not a manifestation of his disability. (Doc. 30-1, pp. 120-21; Doc. 30-60, pp. 1-2). The team reviewed R.E.'s eligibility and determined that a "reeval[uation] for eligibility and IEP changes due to Mom stating his outside testing was greatly different (Mom had not provided team with copies) and his adverse behaviors impeded his learning." (Doc. 30-60, p. 1).

In a letter dated September 27, 2016, the Board's disciplinary placement committee notified Ms. Dowling that R.E.'s conduct would be the subject of a September 30, 2016 hearing and that the committee might recommend to the Board R.E.'s expulsion from the school district. (Doc. 30-62, p. 1). The committee charged R.E. with a violation of Section 3.07 of the Student Handbook, "Sexual offense or harassment," and the committee identified R.E. and Ms. Dowling's rights in relation to the hearing. (Doc. 30-62, pp. 1-2). The committee rescheduled the hearing for October 12, 2016. (Doc. 30-62, pp. 3-4). On October 5, 2016, Ms. Dowling

acknowledged that she received written notice of the upcoming hearing. (Doc. 30-62, p. 4).

In a letter dated October 18, 2016, Superintendent Sisk notified Ms. Dowling that he was considering R.E.'s possible expulsion. (Doc. 30-62, p. 5). He notified Ms. Dowling that the Limestone County BOE Superintendent's Disciplinary Committee would conduct a hearing on October 19, 2016, which could result in R.E.'s expulsion. (Doc. 30-62, p. 5). Ms. Dowling did not attend the hearing. By letter dated October 20, 2016, Superintendent Sisk notified Ms. Dowling of a second hearing scheduled for October 27, 2016 to give her another opportunity to attend. (Doc. 30-62, p. 7).

In a letter dated November 1, 2016, Superintendent Sisk notified Ms. Dowling that the Disciplinary Committee "voted to expel [R.E.] for the remainder of the 2016-17 school year with alternative placement determined with collaboration between the Limestone County Schools Special Education Department and the Limestone County Sheriff's Department." (Doc. 30-62, p. 9). Superintendent Sisk explained Ms. Dowling's appeal rights. (Doc. 30-62, p. 9).

R.E. spent the remainder of the 2016-17 school year in several hospitals and residential mental health treatment facilities including Hill Crest Behavioral Health Services, Mountain View Hospital, Athens-Limestone Hospital, and Decatur

General Hospital.  (Doc. 30-66, p. 1).[18]  Because Limestone County expelled R.E., his IEP team recommended he receive education services at the Limestone County Sheriff's Department in a conference room.  (*See* Doc. 30-1, pp. 128-29).

On March 27, 2017, R.E.'s IEP team completed his disability reevaluation. (Doc. 30-64).  The reevaluation included emotional and behavioral assessments, intellectual function assessments, and observational analysis.  (Doc. 30-64, pp. 1-4). R.E.'s IEP team determined that he was eligible for special education under the designation of Emotional Disability.  (Doc. 30-64, p. 6).  R.E.'s IEP team noted that it had:

> considered eligibility under specific learning disability; however, [R.E.] has concerns other than academic at this time, and the team feels that another category would better fit him.  [R.E.] meets criteria for Intellectual Disability, OHI for ADHD, as well as for Emotional Disability.  The team feels at this time, [R.E.'s] adverse affect [*sic*] in the classroom can best be explained by Emotional Disability, and the team feels that this category is the best that encompasses [R.E.'s] needs at this time.

(Doc. 30-64, p. 6).  Ms. Bachus explained that the team "can only choose one . . . eligibility area" for IEP benefits.  (Doc. 30-1, p. 139).  R.E.'s IEP team prepared an

---

[18] While R.E. was under acute care at Hill Crest, Limestone County provided special education services for him.  Limestone County and R.E.'s IEP team worked with R.E.'s Hill Crest teacher and assigned R.E.'s Limestone County teacher to provide services.  (Doc. 30-1, p. 264).  Limestone County also prepared for R.E. to take the ACT.  It trained two staff members, had R.E.'s accommodations approved through the ACT administrators, and prepared to pay Limestone County staff members to spend a week at Hill Crest to administer the ACT to R.E.  (Doc. 30-1, pp. 264-65).

IEP for the 2017-18 school year that included extended school year services.  (Doc. 30-69).

On September 27, 2017, Ms. Dowling requested a due process hearing and a hearing under Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, and Title VI of the Civil Rights Act of 1964.  (Doc. 30-2, p. 1).  Ms. Dowling raised 20 "Violations/Concerns," (Doc. 30-2, pp. 1-5), and provided a detailed narrative of the allegedly defective services that the Board had provided to R.E., (Doc. 30-2, pp. 1-9).

The due process hearing began on October 25, 2017.  (Doc. 30-1, p. 1).  Ms. Dowling represented R.E.'s interests, and attorney Rod Lewis appeared for the Board.  (Doc. 30-1, p. 1).[19]  The hearing officer explained that because Ms. Dowling was presenting her evidence without the help of an attorney, he would give her "great latitude" to present the evidence she wanted him to consider.  (Doc. 30-1, p. 4). Twelve witnesses testified at the hearing, and the parties placed many school records in the administrative record.  (Doc. 30-1; Doc. 30-6 – Doc. 30-69).

On January 15, 2018, the hearing officer issued his decision.  (Doc. 30-4). The IHO stated that Ms. Dowling's arguments concerned eight issues:

1. Failure to complete a full, individualized, and comprehensive evaluation by September 28, 2015;
2. Improperly conducting a manifestation determination review on September 28, 2015 before the Board conducted a proper reevaluation;

---

[19] Two advocates supported Ms. Dowling.  (Doc. 30-1, p. 1).

3. Failure to conduct a proper manifestation determination on September 28, 2015 by performing the MDR before the alleged conduct code violation hearing;

4. Failure to provide Ms. Dowling and R.E. with their special education rights when R.E.'s placement changed on October 1, 2015;

5. Failure to develop an IEP that provided appropriate services for the educational needs of R.E. during the 2015-2016 regular school year;

6. Failure to design an appropriate IEP by not placing R.E. in the least restrictive environment in the amended IEP dated October 8, 2015;

7. Failure to implement the 2015-16 regular school year IEP, assuming it was properly designed; and,

8. Failure to implement the 2016-17 regular school year IEP during the extended school year, assuming it was properly designed.

(Doc. 30-4, pp. 16-17). The IHO determined that Limestone had not denied R.E. FAPE or violated a provision of the IDEA. (Doc. 30-4, p. 27). The IHO explained that as an IDEA hearing officer, he had jurisdiction over only IDEA matters; he could not address Ms. Dowling's request for relief under § 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, or Title VI of the Civil Rights Act, 42 U.S.C. § 1983. (Doc. 30-4, p. 27).

On March 9, 2018, on behalf of herself and R.E., Ms. Dowling filed this lawsuit against the Limestone County Board of Education. (Doc. 1). Ms. Dowling obtained counsel, (Doc. 20), and amended her complaint, (Doc. 28). The Board has moved for judgment in its favor on Ms. Dowling's claims. (Doc. 45).

## IV.

### IDEA Claims

The IHO observed that Ms. Dowling loves R.E. greatly and has tried to make

certain that R.E. has every service and support available to him under the IDEA. (Doc. 30-4, p. 17).  The Court joins in the IHO's observation.  In his decision, the IHO discussed several of Ms. Dowling's arguments individually and found broadly that none of Ms. Dowling's arguments warranted relief under the IDEA.  In the analysis that follows, the Court addresses Ms. Dowling's alternative arguments for relief under the IDEA.

### *The Adequacy of R.E.'s 2015 Triennial Reevaluation*

Ms. Dowling argues that the Board violated the IDEA because R.E.'s Limestone County IEP team did not complete a full, individualized, and comprehensive three-year reevaluation of R.E. by September 28, 2015. (Doc. 1, p. 11; Doc. 53, p. 2).  As noted at the outset of this opinion, under the IDEA, after a local educational agency conducts a "full and individual initial evaluation" to determine whether a student is disabled and qualifies for special education services, 20 U.S.C. § 1414(a)(1)(A)-(C), the LEA must reevaluate the student at least once every three years, 20 U.S.C. § 1414(a)(2)(A).  When reevaluating a student, an LEA must ensure that the student "is assessed in all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(B).  "In conducting the evaluation," the educational agency must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent," "not use any single measure or assessment as the sole criterion for

42

determining whether a child is a child with a disability or determining an appropriate educational program for the child," and "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. § 1414(b)(2). The "assessment tools and strategies" that an educational agency uses must "provide relevant information that directly assists persons in determining the educational needs of the child are provided." 20 U.S.C. § 1414(b)(3)(C). The educational agency must conduct an evaluation that is "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6). Finally, "assessments of children with disabilities who transfer from 1 school district to another school district in the same academic year are coordinated with such children's prior and subsequent schools, as necessary and as expeditiously as possible, to ensure prompt completion of full evaluations." 20 U.S.C. § 1414(b)(3)(D).

The evidence in the administrative record establishes that R.E. had a three-year evaluation in June of 2012 while he was enrolled in the Limestone County School District. (Doc. 30-12). Therefore, he was eligible for another three-year evaluation in June of 2015 if neither Ms. Dowling nor R.E.'s IEP team sought an evaluation sooner. 20 U.S.C. § 1414(a)(2)(A).

In May of 2015, just before R.E.'s Limestone County IEP team should have conducted a three-year reevaluation, Ms. Dowling enrolled R.E. at The Bridge, a residential drug treatment facility associated with the Attalla City School district. (Doc. 30-15, pp. 1, 7). While R.E. was enrolled at The Bridge, an IEP team there conducted R.E.'s three-year evaluation and developed his IEP for the 2015-16 school year. (Doc. 30-1, pp. 20, 23-24; Doc. 30-15). The Bridge IEP team gave R.E. the TABE and the WIAT. (Doc. 30-15, pp. 1, 17-21, 53). The team also interviewed R.E. and Ms. Dowling and conducted an interest inventory, Casey Life Skills Survey, and Multiple Intelligence Survey with R.E. (Doc. 30-15, pp. 4, 26-51, 53). With these evaluations and past data, the Bridge IEP team believed it had sufficient information to conduct R.E.'s reevaluation and determine his eligibility status. (Doc. 30-15, p. 52). The team stated: "Student has had 3 previous reevaluations with consistent data." (Doc. 30-15, p. 52). The team considered R.E.'s ADHD and his use of Trazodone and Abilify. (Doc. 30-15, pp. 2, 56). The Bridge IEP team determined that R.E. remained qualified for special education services because of a Specific Learning Disability. (Doc. 30-15, pp. 56-57). Ms. Dowling participated by telephone in the Bridge IEP team reevaluation meeting, and she indicated that she agreed with the conclusions in the reevaluation report. (Doc. 30-15, pp. 52, 57).

When R.E. reenrolled in the Limestone County public school district in

August of 2015, his Limestone County IEP team accepted and adopted the Bridge IEP Team's May 2015 eligibility reevaluation. (Doc. 30-1, p. 24; Docs. 30-45, 30-46, 30-47). Ms. Dowling did not ask R.E.'s Limestone County IEP team to revisit the reevaluation.[20] R.E.'s Bridge IEP team did not suggest that the R.E.'s Limestone County IEP team should reevaluate him when he returned to the district from The Bridge. The Bridge IEP team stated: "When [R.E.] returns to his base school, the school will need to write a behavior plan to meet his needs for that particular school." (Doc. 30-15, p. 7). The Limestone County IEP team did so within one month of R.E.'s return, and the team amended his 2015-16 IEP to reflect that R.E. had a behavior that impeded his learning or the learning of others and that he would have services from a behavior teacher twice a week. (Doc. 30-48, pp. 3-4). Given the May 2015 reevaluation, by statute, R.E.'s Limestone County IEP team could not have reevaluated him again until May 2016 unless Ms. Dowling and R.E.'s IEP team agreed that another assessment was needed. 20 U.S.C. § 1414(a)(2)(B)(i); *T.P. ex rel. T.P.*, 792 F.3d at 1288 n. 6.

The May 2015 Bridge reevaluation that the Board's IEP team adopted met the requirements of 20 U.S.C. § 1414(b)(2) because the Bridge IEP team administered

---

[20] The Court does not suggest that Ms. Dowling bore the burden of requesting a reevaluation for R.E. R.E.'s Limestone County IEP team had an independent obligation to seek Ms. Dowling's permission to reevaluate R.E. if the team believed R.E. needed another evaluation in 2015. *Phyllene W.*, 630 Fed. Appx. at 926. The Court merely points out that Ms. Dowling did not request another evaluation to cause the Board to reevaluate R.E. when he returned to the Limestone County school district in August 2015.

and used a variety of assessment tools and strategies "to gather relevant functional, developmental, and academic information, including information provided by the parent." The Bridge team did not "use any single measure or assessment as the sole criterion for determining" whether R.E. continued to qualify as a child with a disability or for determining "an appropriate educational program for the child," and the Bridge team used "technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." The Bridge IEP team observed R.E.'s behavior, stated that he "already was showing improvement," and indicated that he had "good social skills and [was] very polite." (Doc. 30-15, p. 1).

Thus, the Bridge IEP team's May 2015 reevaluation of R.E. was statutorily sound, and nothing happened between R.E.'s reenrollment in the Limestone County district in August 2015 and September 28, 2015 to cause Ms. Dowling to request another evaluation or to cause R.E.'s Limestone County IEP team to ask Ms. Dowling for permission to evaluate R.E. again. Therefore, the Court affirms the IHO finding that the Board did not violate the IDEA with respect to R.E.'s 2015 three-year reevaluation.

### R.E.'s Manifestation Determination Reviews

Ms. Dowling argues that the 2015 and 2016 manifestation determination reviews that the Board conducted in association with disciplinary proceedings

concerning R.E. were procedurally flawed.  The Eleventh Circuit has explained that "[n]ot every procedural defect results in a violation of the IDEA.  Rather, '[i]n evaluating whether a procedural defect has deprived a student of a FAPE, the court must consider the impact of the procedural defect, and not merely the defect *per se*.'  *See Weiss by Weiss v. School Bd. of Hillsborough Cnty.,* 141 F.3d 990, 994 (11th Cir. 1998)."  *G.J. v. Muscogee Cnty Sch. Dist.*, 668 F.3d 1258, 1270 (11th Cir. 2012); *see also T.P.*, 792 F.3d at 1293 (discussing 20 U.S.C. § 1415(f)(3)(E)(ii)); *Phyllene W.*, 630 Fed. Appx. at 919.  "'If the educational benefits are adequate based on surrounding and supporting facts, [IDEA] requirements have been satisfied." *JSK By and Through JK v. Hendry Cty. Sch. Bd.*, 941 F.2d 1563, 1573 (11th Cir.1991). Adequacy is determined on a case-by-case basis in light of the child's individual needs. *Id.*"  *Phyllene W.*, 630 Fed. Appx. at 919.  Thus, Ms. Dowling must demonstrate that the procedural practices that she challenges deprived R.E. of adequate educational benefits.

Ms. Dowling argues first that the MDRs were flawed because R.E.'s IEP team made manifestation determinations before the district held due process hearings to determine whether R.E. had, in fact, violated the Board's code of student conduct. As noted, the IDEA provides:

> within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team . . . shall review all relevant information in the student's file,

47

> including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability, or if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

20 U.S.C. § 1415(k)(1)(E)(i)-(ii); *see also* ALA. ADMIN. CODE 290-8-9-.09(2)(c)(1).

A "change of placement occurs if the [student's] removal is for more than 10 consecutive school days." 34 C.F.R. § 300.536(a)(1). Under the IDEA,

> if school personnel seek to order a change in placement that would exceed 10 school days and the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability . . ., the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities, except as provided in section 1412(a)(1) . . . although it may be provided in an interim alternative educational setting.

20 U.S.C. § 1415(k)(1)(C).

The IHO explained that "[t]he purpose of the 10-day requirement is to ensure that the IEP team conducts a prompt review of the student's behavior to determine whether it is a manifestation of his or her disability." (Doc. 30-4, p. 21). The IHO did not "interpret 20 U.S.C. § 1415(k)(1)(E)(i) as prohibiting the IEP team from conducting manifestation review before a final decision to change a student's placement has been made," (Doc. 30-4, p. 21), and the IHO determined that R.E. suffered no harm because the MDR occurred before the district pursued formal disciplinary action, (Doc. 30-4, pp. 21-22). The Court agrees.

48

Under § 1415(k)(1)(C), a school district's ability to follow its "disciplinary procedures applicable to children without disabilities" when "school personnel seek to order a change in placement" of a student "that would exceed 10 school days" turns on the manifestation determination made by the student's IEP team pursuant to 20 U.S.C. § 1415(k)(1)(E)(i)-(ii).  If the IEP team determines that the "conduct in question was caused by, or had a direct and substantial relationship to, the child's disability, or if the conduct in question was the direct result of the local educational agency's failure to implement the IEP," then the district may not use its disciplinary procedures for children without disabilities.  Those procedures presumably include the due process hearing to examine an alleged code of conduct violation that would support a change of placement for more than 10 days.  If the IEP team determines the conduct was a manifestation of a child's disability or the district's failure to implement the child's IEP, then the IEP must perform a functional behavior assessment, implement a behavioral intervention plan, and "return the child to the placement from which the child was removed," or–review and update an existing behavioral plan and return the child to his LRE placement.   20 U.S.C. § 1415(k)(1)(F).  In short, read together, §§ 1415(k)(1)(E) and 1415(k)(1)(F) indicate that a child with a disability should not go through the disciplinary process at all if his IEP team determines that his conduct was a manifestation of his disability or a consequence of the failed implementation of his IEP.  If the Court has read the statute

correctly, then R.E.'s IEP team properly conducted MDRs before the Board's disciplinary placement committee held disciplinary hearings concerning R.E.'s alleged code of student conduct violations.[21]

If the Court has misunderstood 20 U.S.C. § 1415(k)(1)(E) and 20 U.S.C. § 1415(k)(1)(C), and a disciplinary hearing and disciplinary findings must precede a manifestation determination for a child with a disability, then the Court affirms the IHO's determination that the alleged procedural defect does not constitute a violation of the IDEA because the order of the proceedings had no substantive impact on the resolution of the code of conduct violations attributed to R.E. For R.E.'s September 2015 and September 2016 MDRs, R.E.'s IEP team met, assumed that the reported conduct had occurred, and examined whether the alleged behavior constituted a manifestation of R.E.'s SLD disability classification. (Doc. 30-51;

---

[21] The meaning of the word "decision" in the phrase "any decision to change the placement of a child" in 20 U.S.C. § 1415(k)(1)(E) is not clear. Logically, to determine what procedure it must follow, a school district must decide preliminarily whether a student's alleged misconduct warrants removal for more than 10 days. The potential consequence dictates a school district's procedural obligations to the student and his parents. In addition, the district must communicate the potential consequence in the notice the district provides to the student and the student's parents when the district schedules a disciplinary hearing. The notice and the hearing allow the student to respond to the charge and the proposed discipline. If this preliminary "decision" triggers the need for a manifestation determination for a child with a disability, then the determination should occur before the disciplinary hearing. If the word "decision" connotes a final decision following a disciplinary hearing, then for a child with a disability, a disciplinary committee must make the consequence that it selects contingent on the results of a manifestation determination, and a child with a disability must go through the ordinary disciplinary process before his IEP team determines whether he may be subject to the consequence identified through that process.

Doc. 30-60).[22]  The IEP team considered R.E.'s eligibility information, his IEPs, teacher reports, information that Ms. Dowling provided, and past disciplinary infractions.  The team considered not only R.E.'s SLD but also his ADHD and the mental health diagnoses that Ms. Dowling provided.  (Doc. 30-1, pp. 155-57).  Thus, R.E.'s IEP team complied with 20 U.S.C. § 1415(k)(1)(E)(i).  The members of the IEP team other than Ms. Dowling concluded that R.E.'s conduct was not a manifestation of his disability.  (Doc. 30-4, pp. 11, 15).[23]  Based on those decisions, R.E.'s IEP team referred the matters to the Superintendent's disciplinary committee.

The disciplinary committee sent Ms. Dowling letters to inform her of the disciplinary hearings and the consequences the committee was considering.  (Doc.

---

[22] The Court has not found evidence in the administrative record that suggests that Ms. Dowling disputed either incident that prompted the school district to consider disciplinary action against R.E.

[23]  At the administrative hearing, Ms. Bachus testified that she recalled that everyone in R.E.'s MDR meetings agreed that his conduct was not a manifestation of his disability.  (Doc. 30-1, pp. 259-60).   An amendment to R.E.'s 2015-16 IEP states that everyone on the IEP team "decided/agreed" that R.E.'s September 2015 conduct was not a manifestation of his disability.  (Doc. 30-54, p. 2).  The documentation from the MDRs indicates that no one dissented from the September 2015 MDR, (Doc. 30-51, p. 2), and a representative of Hill Crest Behavioral Center where R.E. was hospitalized in September 2016 dissented from the September 2016 MDR finding that R.E.'s conduct was not a manifestation of his disability, (Doc. 30-60, pp. 1-2).  Her objection is dated two weeks before the MDR meeting occurred.  (Doc. 30-60, p. 2).  The IHO accepted Ms. Dowling's statement during the administrative hearing that she dissented from the IEP team's MDR findings.  (Doc. 30-4, pp. 11, 15).  Applying the deferential standard for credibility determinations, the Court accepts the IHO's finding that Ms. Dowling dissented from the MDR determinations because there is no clear evidence in the record to contradict it.  Ms. Bachus's reference to R.E.'s IEP team in some of the documentation of the MDR proceedings may have been a reference to the district's members of the IEP team.  Without clear evidence to contradict the IHO's finding, the Court accepts the IHO's conclusion concerning this conflicting evidence.

30-52, pp. 1-2; Doc. 30-62, pp. 1-8).[24]  After the hearings, Ms. Dowling received

notices of the actions that the disciplinary committee had taken, placing R.E. in

Alternative School in October 2015 and expelling R.E. in November 2016.  (Doc.

30-52, p. 3; Doc. 30-62, p. 9).   In both instances, R.E.'s IEP team provided

educational programs during the disciplinary placements.  (Doc. 30-53; Doc. 30-54,

p. 3; Doc. 30-64, p. 4).

On this record, even if the Board violated the IDEA procedurally, the violation

did not impede R.E.'s right to a FAPE, significantly impede Ms. Dowling's ability

to participate in the decision-making process, or cause R.E. to be deprived of

educational benefits.  20 U.S.C. § 1415(f)(3)(E)(ii).  Because the IEP team assumed

that R.E. engaged in the conduct charged and considered in R.E.'s MDRs the

information that 20 U.S.C. § 1415(k)(1)(E)(i) required, the MDRs were not

substantively deficient, and the order of the MDR meetings and disciplinary

proceedings is inconsequential.

For her second challenge to R.E.'s 2015 and 2016 MDRs, Ms. Dowling argues

that the Board violated the IDEA because R.E.'s IEP team did not give her a copy

of a Special Education Rights document when the district changed R.E.'s placement

in the fall of 2015 and in the fall of 2016.  (Doc. 1, pp. 21-26; Doc. 53, pp. 16-17,

---

[24] The Board's Disciplinary Committee rescheduled the 2016 proceeding several times to give Ms. Dowling an opportunity to attend if she wished.  (Doc. 30-62, pp. 1-8).

19).  The Alabama State Department of Education issues a Special Education Rights document annually and posts the document on the department's website at www.alsde.edu.   ALA. ADMIN. CODE § 290-8-9-.08(6).   The district changed R.E.'s placement twice in 2015, once when the district assigned him to the Alternative School for 15 days and once when the district assigned him to Colt Academy.  The district changed R.E.'s placement in 2016 when the district expelled him.  The IHO determined that Ms. Dowling received a copy of her rights at the 2015 MDR and that the district was not required to give her another copy of the rights a short time later when it placed R.E. at Colt Academy.  (Doc. 30-4, pp. 22-23).  The IHO did not specifically address Ms. Dowling's arguments regarding the 2016 disciplinary proceeding.

Under the IDEA, R.E.'s IEP team had to give Ms. Dowling a copy of the Special Education Rights document once each year.  20 U.S.C. § 1415(d)(1)(A). Under the IDEA and state regulations, the district also had to provide a copy of the rights document to Ms. Dowling in connection with disciplinary proceedings.  20 U.S.C. § 1415(k)(1)(H); ALA. ADMIN. CODE § 290-8-9-.08(6)(c).

The record indicates that Ms. Dowling had a copy of the Special Education Rights document in advance of the September 2015 manifestation determination

meeting.  (Doc. 30-50).[25]  In the written notice R.E.'s IEP team provided Ms. Dowling before the meeting, the team offered to provide another copy of the document to Ms. Dowling and to answer questions she might have about the document.  (Doc. 30-50).  Ms. Bachus testified that Ms. Dowling received a copy of the Special Education Rights document at the 2015 manifestation determination meeting and that the district routinely provides the Special Education Rights document to parents at manifestation determination meetings and offers to explain the document.  (Doc. 30-1, pp. 34-35, 45-46).  The IHO credited Ms. Bachus's testimony.  (Doc. 30-4, p. 22).  Applying the deferential credibility standard, the Court accepts the finding because there is no contrary evidence in the record other than Ms. Dowling's statement that the team did not give her a copy of her rights. Because R.E.'s IEP team held the September 2015 MDR meeting in conjunction with the 2015 disciplinary proceeding that led to R.E.'s placement at the district's Alternative School, the Court affirms the IHO's finding that Ms. Dowling received a copy of the Special Education Rights document as part of the district's efforts to address R.E.'s September 2015 code of conduct violation.  (Doc. 30-52).

---

[25] Ms. Dowling acknowledges that she received a copy of the Special Education Rights document in May of 2015 from The Bridge, and she stated that she received another copy "during the resolution meeting."  (Doc. 30-1, p. 250; *see also* Doc. 30-54, p. 15).  The MDR notice that refers to Ms. Dowling's copy of the Special Education Rights document is mistakenly dated September 21, 1915.  (Doc. 30-50).  The date should read September 21, 2015.

The Court departs from the IHO's factual finding with respect to R.E.'s placement at Colt Academy after he left the Alternative School. The IHO found that the district did not have to give Ms. Dowling a copy of the Special Education Rights document when the district moved R.E. to Colt Academy in October 2015 because R.E.'s IEP team made a "non-disciplinary decision to change R.E.'s placement." (Doc. 30-4, p. 23). The administrative evidence is more nuanced; it indicates that R.E.'s placement at Colt Academy was not entirely divorced from his disciplinary proceedings.

The Board's disciplinary committee proposed the Colt Academy placement. (Docs. 30-52, 30-53). After the disciplinary committee recommended the placement, R.E.'s IEP team considered the proposal during a team meeting on October 8, 2015. The team moved forward with the Colt Academy placement on November 6, 2015 "due to disciplinary infractions which lead to many school placements." (Doc. 30-54, p. 3; *see also* Doc. 30-1, pp. 39-40, 58). The fact that R.E.'s IEP team made the placement decision does not isolate the decision from the disciplinary proceedings that immediately preceded the placement. Therefore, the Colt Academy placement, though not punitive, was not unrelated to the disciplinary proceedings that took place shortly before R.E.'s IEP team selected the Colt

55

Academy placement.[26]

Because the Colt Academy placement was intertwined with the 2015 disciplinary proceeding, the rights document that R.E.'s IEP team provided to Ms. Dowling in connection with the September 2015 MDR extended to R.E.'s related four-week placement at Colt Academy in October 2015. The IEP team directed Ms. Dowling to that document in the written notice the team provided to her of the "alternative school/colt academy placement," and the team offered to provide another copy of the document to Ms. Dowling. (Doc. 30-53). At worst, the Board's failure to give Ms. Dowling another copy of the rights document at the October 2015 IEP team meeting is a technical rule violation because Ms. Dowling received copies of the document in May 2015 and September 2015.

Ms. Dowling asserted in her due process complaint and at the administrative hearing that, had she received the rights document in connection with the Colt Academy placement, she would have challenged the placement. (Doc. 1, p. 23; Doc.

---

[26] At the administrative hearing, Ms. Bachus testified that "going to Colt Academy is not a disciplinary change." (Doc. 30-1, p. 46). Ms. Bachus explained that Colt Academy provides "positive support" to address a "pattern of behavior." (Doc. 30-1, p. 38; *see also* Doc. 30-1, p. 58). R.E.'s IEP team placed him at Colt Academy to address a range of disrespectful and disruptive behaviors that were impacting his ability to learn. (Doc. 30-1, pp. 40-41). Still, in the notice of R.E.'s placement at the Alternative School, his IEP team wrote: "[R.E.] had an alternative school hearing which resulted in alternative school/colt academy placement." (Doc. 30-53). The team explained: "The IEP Team made the decision to place [R.E] in alternative school due to behavior concerns and disciplinary infractions/threats." (Doc. 30-53). When the team amended R.E.'s 2015-16 IEP to document the team's October 8, 2015 meeting to discuss R.E.'s placement, the team wrote: "The IEP team is meeting to change school placement from East Limestone High School to the alternative school/colt academy." (Doc. 30-54, p. 3).

30-1, pp. 227-29).  As discussed, the evidence establishes that Ms. Dowling had a copy of the document, but even if she did not have it and opted not to respond to the IEP team's invitation to request another copy, apart from the rights document, the district advised Ms. Dowling of her right to challenge the result of the 2015 disciplinary committee findings which included a recommendation for placement at Colt Academy.  (Doc. 30-52) ("If you feel this assignment is unjustified, you may appeal this decision."); (Doc. 30-53) ("The local education agency's proposed action will be taken in 10 calendar days to afford the parent a reasonable period of time to consider the proposed action.").  Therefore, even if the district did not give Ms. Dowling a copy of the rights document in September 2015 and even if the district should have given Ms. Dowling another copy of the rights document weeks later when R.E.'s IEP team decided to place him at Colt Academy after he completed his 15-day assignment to the Alternative School, the omission would be harmless because Ms. Dowling had adequate notice of her rights.  As discussed, a harmless procedural error will not support a finding of an IDEA violation.

The records concerning the 2016 MDR proceedings are much like the records concerning the 2015 proceedings.  After R.E. exposed himself to his homebound teacher and the district indicated that it was considering expulsion, R.E.'s IEP team gave Ms. Dowling notice that the team would conduct a manifestation determination meeting.  (Doc. 30-59, p. 14).  The team provided a copy of the Special Education

57

Rights document with the written notice for the meeting.  (Doc. 30-59, p. 14).  After the IEP team determined at the MDR that R.E.'s conduct was not a manifestation of his disability, (Doc. 30-59, p. 15; Doc. 30-60), the district's disciplinary committee notified Ms. Dowling that it would hold a disciplinary hearing.  The committee postponed the hearing to give Ms. Dowling an opportunity to attend.  (Doc. 30-62). After the hearing, the district's superintendent notified Ms. Dowling that his disciplinary committee had voted to expel R.E. for the balance of the 2016-17 academic year, and he advised Ms. Dowling of her appeal rights.  (Doc. 30-62, p. 9). Therefore, the record does not support Ms. Dowling's allegation that a procedural error occurred during R.E.'s 2016 disciplinary proceedings, but even if there had been a technical error, the error would be harmless because the district provided adequate notice of all proceedings and of Ms. Dowling's appeal rights.[27]

### LRE at Colt Academy

Ms. Dowling argues that the Board violated the IDEA when it placed R.E. at Colt Academy because, before it made the placement, R.E.'s IEP team did not consider supplemental aids that the district could have used to allow R.E. to remain at East Limestone County High.  Consequently, in Ms. Dowling's view, the district

---

[27] Ms. Dowling also received a copy of the rights document in May 2016 with R.E.'s IEP for the 2016-17 academic year, (Doc. 30-55, p. 11), and R.E.'s IEP team gave Ms. Dowling another copy of the special education rights document at a March 2017 meeting concerning R.E.'s reevaluation, (Doc. 30-64, pp. 8-9).

did not comply with its obligation to educate R.E. in the least restrictive environment.

The IHO concluded that R.E.'s IEP team did not violate the IDEA when the team placed him at Colt Academy. The IHO rejected Ms. Dowling's assertion that the placement was punitive, (Doc. 30-1, p. 229), and found that the placement was based on R.E.'s individual needs. (Doc. 30-4, p. 25). Relying on Ms. Bachus's testimony, the IHO found that Colt Academy is "an evidence-based program which provides 'intensive positive behavior support' to students." (Doc. 30-4, p. 12 (citing Doc. 30-1, pp. 37-39, 58)). The IHO found that at Colt Academy, students "receive more positive behavior support, increased behavior counseling services, increased social skills instruction, and increased transition services" and that placement at Colt Academy was needs-based, not punitive. (Doc. 30-4, p. 13 (citing Doc. 30-1, pp. 38, 58, 262-63)). The IHO credited Ms. Bachus's testimony that R.E.'s IEP team placed him at Colt Academy to address misbehavior that was not related to his threat to buy a gun. (Doc. 30-4, p. 13 (citing 30-1, p. 41)).

As noted, under the IDEA, a local education agency must provide free appropriate public education in the least restrictive environment. When a parent challenges a placement outside of the regular classroom, a court must examine "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily." *Greer v. Rome City Sch. Dist.*, 950 F.2d

688, 696-97 (11th Cir. 1991).[28]

> [B]efore the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classroom. The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, for which it is obligated under the Act and the regulations promulgated thereunder to make provision. Only when the handicapped child's education may not be achieved satisfactorily, even with one or more of these supplemental aids and services, may the school board consider placing the child outside of the regular classroom.

*Greer*, 950 F.2d at 696.

Sometimes, because of a student's unique needs, a regular classroom is not a "suitable setting" for a child with a disability. *Greer*, 950 F.2d at 695 (citing *Rowley*, 458 U.S. at 181 n. 4).

> [T]he Act's mandate for a free appropriate public education qualifies and limits its mandate for education in the regular classroom. Schools must provide a free appropriate public education and must do so, to the maximum extent appropriate, in regular education classrooms. But when education in a regular classroom cannot meet the handicapped child's unique needs, the presumption in favor of mainstreaming is overcome and the school need not place the child in regular education.

*Greer*, 950 F.2d at 695 (quoting *Daniel R.R. v. State Bd. of Edu.*, 874 F.2d 1036, 1045 (5th Cir. 1989)).[29]  When the education of a child with a disability cannot be

---

[28] The Eleventh Circuit Court of Appeals withdrew its original opinion in *Greer* because of a jurisdictional issue.  The Court of Appeals reinstated its LRE analysis in 1992.  *Greer v. Rome City. Sch. Dist.*, 967 F.2d 470 (11th Cir. 1992).

[29] In *Rowley*, the Supreme Court stated:

achieved satisfactorily in the regular classroom with the use of supplemental aids and services, a court must determine "whether the school has mainstreamed the child to the maximum extent appropriate." *Greer,* 950 F.2d at 696-97.

The Eleventh Circuit Court of Appeals has instructed courts to consider several factors when deciding whether a school district can educate a child with a disability satisfactorily in a regular classroom. Though not an exhaustive list of factors, a district court should "compare the educational benefits that the [] child will receive in a regular classroom, supplemented by appropriate aids and services, with the benefits he or she will receive in a self-contained special education environment;" "consider what effect the presence of the [] child in a regular

---

Despite this preference for "mainstreaming" handicapped children—educating them with nonhandicapped children—Congress recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children. The Act expressly acknowledges that "the nature or severity of the handicap [may be] such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." § 1412(5). The Act thus provides for the education of some handicapped children in separate classes or institutional settings. See *ibid.*; § 1413(a)(4).

*Rowley*, 458 U.S. at 181 n. 4. Section 1412(a)(5)(A) provides:

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

61

classroom would have on the education of other children in that classroom;" and "consider the cost of the supplemental aids and services that will be necessary to achieve a satisfactory education for the [] child in the regular classroom." *Greer*, 950 F.2d at 697. "[W]here a [] child is so disruptive in a regular classroom that the education of other students is significantly impaired, the needs of the handicapped child cannot be met in that environment. Therefore regular placement would not be appropriate to his or her needs." *Greer*, 950 F.2d at 697 (citing 34 C.F.R. § 300.552 comment (quoting 34 C.F.R. part 104—Appendix, Paragraph 24)). "[N]o single factor will be dispositive under this test. 'Rather, our analysis is an individualized, fact-specific inquiry that requires us to examine carefully the nature and severity of the child's handicapping condition, his needs and abilities, and the schools' response to the child's needs.'" *Greer*, 950 F.2d at 696 (quoting *Daniel R.R.*, 874 F.2d at 1048).

Here, to decide whether the district could educate R.E. in the regular classroom, the Court considers the context in which R.E.'s October 2015 placement at Colt Academy occurred. For the 2014-15 academic year, R.E. attended Tanner High School. Early in 2015, after a series of disciplinary infractions, R.E. was placed at the Alternative School for 21 school days to address "defiant/disruptive behaviors which impede the learning of himself and others." (Doc. 30-14, p. 13). R.E.'s IEP team found that he could "control his behavior for the discipline infractions

discussed" and that "peer attention, power control, and avoidance" were the reasons for R.E.'s behavior. (Doc. 30-14, p. 14; Doc. 30-42, p. 1). R.E.'s IEP team amended his 2014-15 IEP to add services for weekly behavior counseling. (Doc. 30-14, pp. 18-28).

Because R.E. was cited for several disciplinary infractions while he attended the Alternative School, his IEP team met again in April 2015. The team noted that R.E. had recently lost his father and recorded that:

> [R.E.] exhibits defiance/disruption/disrespect on daily basis throughout the day, but more frequent in the morning till [*sic*] around 11AM each day. [R.E.] chews food and spits it in the floor, chews forks and keeps in mouth, refuses to complete work even with one to one support and continuous prompting, unplugs all the computers in the room, repeatedly up and down out of seat, loudly blurts out what he is and isn't going to do, crawls on floor and eats bits of paper picked up from floor, uses sexually inappropriate gestures with hands and body parts, lays in the floor while laughing out load [*sic*], refuses to follow teacher and administrative directives. [R.E.] sleeps and is difficult to wake up.

(Doc. 30-14, p. 5; Doc. 30-44, p. 1). Ms. Dowling informed the team that R.E.'s behavior at home had deteriorated. She explained that his "outside mental health providers" could not change his prescription medication until R.E. had "a clean drug screening." (Doc. 30-14, p. 5; Doc. 30-44, p. 1). R.E.'s IEP team determined that he "would benefit from an environment that reduced opportunities to gain attention by exhibiting adverse behaviors" and referred R.E. to the Limestone County Multi-Needs team "for possible support from additional outside agencies to better manage

student behaviors to help increase academic progress and successful school participation." (Doc. 30-14, p. 5). The team added weekly homebound services for academics; counseling services from the district's behavior counselor "in an alternate setting" for anxiety, defiant, and disruptive behaviors; and skills intervention services. (Doc. 30-14, pp. 5, 11). R.E.'s IEP team amended his LRE designation, stating that the designation changed to an "alternate setting due to repeated defiant/disruptive behaviors which impede the learning of himself and others." (Doc. 30-14, p. 13). The team stated that R.E. needed "daily positive behavior support/intervention to address defiant and disruptive behaviors." (Doc. 30-14, p. 13). The team indicated that it would reconvene at the end of May "to determine IEP services and LRE for the 2015-16 school year and review student progress." (Doc. 30-14, p. 5).

Before the Limestone County IEP team could do so, Ms. Dowling admitted R.E. to The Bridge in Etowah County, Alabama. When R.E. returned to the district in August 2015, Ms. Dowling enrolled him at East Limestone High School. (Doc. 30-1, p. 110). On August 31, 2015, Ms. Bachus notified Ms. Dowling that R.E.'s Limestone County IEP team planned to amend his 2015-16 Bridge IEP to reflect that he had a behavior that impeded his learning or the learning of others, to add services from a behavior teacher for 30 minutes two times each week, and to "address the appropriate times the behavior teacher will provide intervention for [R.E.]." (Doc.

30-48, pp. 1, 3-4; *see also* Doc. 30-54, p. 2).  A few days later, R.E. "stated that he needed to purchase a gun after talking with [a teacher] concerning his defiance." (Doc. 30-52, p. 1).   The threat violated the Limestone County Code of Student Conduct.

While R.E. was placed at the Alternative School to address the violation, in October 2015, his IEP team met to consider his placement when he left the Alternative School.  Ms. Dowling attended the meeting.  (Doc. 30-1, pp. 39-40). The team, through its September 2015 MDR meeting, knew that in the first few weeks of the fall semester, R.E. had been disciplined for:

- Infraction (cell phone) 8/31/15 Student off task and violated BYOD policy. 5 days after school detention

- Infraction (other incident) 9/3/15 Slapping another student during class. 1 day Out of School Suspension

- Infraction (A-other incident S99) [R.E.] did not bring his books to class.  1 day after school detention

- Infraction (other incident) 9/15/15 [R.E.] came into the classroom after school pictures.  His pullover was unzipped.  He pulled it down and showed his nipple.  Instructional Aide directed him to zip up his pullover and have a seat.  [R.E.] told the aide that she was not his mom and does not tell him what to do and cursed.  1 day in school suspension.

- Infraction (defiance of authority) 9/16/15 [R.E.] was playing video for all the other students with ninja turtles cussing.  Teacher directed [R.E.] to turn in his phone.  [R.E.] turned it in, but took it back from the teacher and would not give it back.  Refused to sit down and said

that he was not going to have a seat, even for administration.  3 days of ISS.

- Infraction (threats/intimidation) 9/21/16 Student made the comment that he was going to have to get a gun.  4 days of out of school suspension, while pending manifestation determination review.

(Doc. 30-54, pp. 2-3).  In a three-week period, R.E. had exceeded his IEP behavior goal of four office referrals in a nine-week grading period.  (Doc. 30-54, p. 3).  The team discussed with Ms. Dowling whether Colt Academy might provide better support for R.E. and serve as his least restrictive environment after he completed his term at the Alternative School.  (Doc. 30-1, pp. 39-41, 229).

R.E.'s IEP team met on November 8, 2015 and "decided that Colt Academy [was] the best school placement for [R.E.] due to his disciplinary infractions which lead to his many school placements."  (Doc. 30-54, p. 3).  The team amended R.E.'s IEP and reduced his LRE to "less than 40% of the day" in a regular classroom.  (Doc. 30-54, p. 15).  R.E.'s amended IEP does not indicate whether his IEP team considered other supplemental aides and services to provide R.E. more time in the regular classroom.  Ms. Bachus testified that at the November meeting, R.E.'s IEP team considered in more detail what behavior supports services "would look like." (Doc. 30-1, p. 56).  Ms. Bachus believed that the team could "show a progression of things that [they] had attempted and tried."  (Doc. 30-1, p. 58).

At first glance, R.E.'s situation seems to resemble the situation that led the Eleventh Circuit in *Greer* to find a violation of the IDEA.  Ms. Bachus's vague,

conclusory testimony about the IEP team's effort to identify behavior supports to allow R.E. to study in a regular classroom is much like the teacher testimony the Eleventh Circuit rejected in *Greer*. So too is the amended 2015-16 IEP that contains no information about alternatives that R.E.'s IEP team considered and rejected. *Greer*, 950 F.2d at 698. But upon closer examination, the record here is different from the record in *Greer* in two significant respects.

First, in *Greer*, for years, the student's IEP team had information about the student's hearing deficits, but the team did not take steps to evaluate those deficits and address them in the student's IEP. In contrast, R.E.'s Limestone County IEP team took several steps to address R.E.'s disruptive behavior before the team placed him at Colt Academy. In early 2015, R.E.'s Limestone County IEP team had included in his IEP strategies to address his misbehavior in the general educational setting, but he still had nine office referrals by February 2015. (Doc. 30-14, pp. 14-15). Just over six months before R.E.'s Limestone County IEP team decided to place him at Colt Academy, the IEP team, working with teachers from Tanner High School, amended his LRE designation, and assigned R.E. to an "alternate setting due to repeated defiant/disruptive behaviors which impede the learning of himself and others." (Doc. 30-14, p. 13). The team indicated in R.E.'s amended IEP for 2014-15 that he would receive counseling services from the district's behavior counselor and "daily positive behavior support/intervention." The team intended to reconsider

the alternative placement approximately one month after the team amended R.E.'s IEP, but the team did not have the chance because Ms. Dowling moved R.E. to The Bridge program, interrupting the district's efforts to address R.E.'s disruptive behaviors.  As the Court discusses in greater detail below, even when the record establishes a violation of the IDEA, a parent cannot succeed in district court if the "parent's own actions frustrated the school's efforts." *Loren F.*, 349 F.3d at 1312.

Second, unlike the kindergarten student in *Greer* whose conduct did not interfere with her classmates' ability to learn, R.E.'s conduct had become so disruptive in a regular classroom by April 2015 that his misconduct impaired his ability to learn and the ability of other students in his class to learn.  Between August 31, 2015 and September 21, 2015, R.E. had six disciplinary infractions that included slapping another student during class, taking his phone from a teacher who instructed him to turn it in, and commenting that he was "going to have to get a gun" when a teacher spoke to him about his defiance.  The only time in 2015 that R.E.'s behavior did not impede his learning or the learning of others was the two-month period when he studied at The Bridge.  (Doc. 30-15, p. 3; Doc. 30-15, p. 2 (stating that in his interactions with instructors at The Bridge, R.E. was "very polite and respectful to his teachers"); Doc. 30-14, p. 6, line 1; Doc. 30-54, p. 1, line 1; *see also* Doc. 30-1, pp. 23-24 (establishing that R.E. attended The Bridge program from May 2015 through June 2015)).  R.E.'s disruptive behavior justifies the decision to move him

to Colt Academy so that he could receive intensive behavioral support.  *Greer*, *supra*.

Therefore, R.E.'s IEP team did not violate the least restrictive environment requirement under the IDEA when the team placed R.E. at Colt Academy in November 2015.

### Failure to Implement R.E.'s IEP During the 2015-16 and 2016-17 Terms

Ms. Dowling contends that the Board violated the IDEA because R.E.'s Limestone County IEP team's implementation of his 2015-16 IEP and his 2016-17 IEP was deficient in many respects.  (Doc. 53, pp. 28-39).  When examining a school district's implementation of an IEP, a court must "compare the services that are actually delivered to the services described in the IEP" and "consider implementation failures both quantitatively and qualitatively to determine *how much* was withheld and *how important* the withheld services were in view of the IEP as a whole."  *L.J. by N.N.J.*, 927 F.3d at 1214 (emphasis in *L.J.*).  A child's "educational progress (or lack thereof) can be evidence of the materiality of an implementation failure—but it is not dispositive."  *L.J. by N.N.J.*, 927 F.3d at 1214 (citing *Endrew F.*, 386 U.S. at 398-99).  A district court "should not rely too heavily on actual educational progress, at least where a plaintiff has not tied the lack of progress to a specific implementation failure.  It is merely one piece of evidence courts may use in assessing whether a school failed to implement substantial or significant

69

provisions of the IEP." *L.J. by N.N.J.*, 927 F.3d at 1214.  A court also must consider "the cumulative impact of multiple implementation failures when those failures, though minor in isolation, conspire to amount to something more." *L.J. by N.N.J.*, 927 F.3d at 1215.  "[T]o prevail in a failure-to-implement case, a plaintiff must demonstrate that the school has materially failed to implement a child's IEP.  And to do that, the plaintiff must prove more than a minor or technical gap between the plan and reality; *de minimis* shortfalls are not enough.  A material implementation failure occurs only when a school has failed to implement substantial or significant provisions of a child's IEP." *L.J. by N.N.J.*, 927 F.3d at 1211.

*2015-16 IEP*

Ms. Dowling challenges R.E.'s IEP team's use of the Edgenuity program while R.E. attended Colt Academy in the fall of 2015.  The IHO found that Ms. Dowling "primarily attempt[ed] to draw inferences from Edgenuity login records; however, there was no testimony at the due process hearing to interpret the Edgenuity records, and Edgenuity was not the only source of coursework provided to R.E. while at [Colt Academy]."  (Doc. 30-4, p. 25).  The IHO also pointed out that R.E. attended Colt Academy for only four weeks.  (Doc. 30-4, p. 25).

The record supports the IHO's findings.  Kelly Suthard was R.E.'s special education teacher during the four weeks he attended Colt Academy.  (Doc. 30-1, pp. 60, 64, 177, 180).  At the administrative hearing, Ms. Suthard explained that R.E.

used Edgenuity to complete assignments he received while he attended Colt Academy, but he did not use the program to complete assignments that he had received from East Limestone High School, and he did not use the program to complete assignments from the Alternative School that followed him to Colt Academy. (Doc. 30-1, pp. 181-82). Ms. Bachus testified that R.E. used Edgenuity at Colt Academy for credit recovery, but he also received face-to-face instruction. (Doc. 30-1, pp. 83-84).[30]

Much of Ms. Dowling's argument concerning the implementation of R.E.'s IEP while he attended Colt Academy rests on supposition. During the administrative hearing, Ms. Dowling had the opportunity to develop evidence about R.E.'s coursework at Colt Academy, but she opted not to examine Ms. Suthard to explore this topic. (Doc. 30-1, pp. 179-82). Ms. Suthard could have provided details concerning the Edgenuity program and the ways in which R.E. completed assignments that he received through the program. She also could have explained how R.E. fulfilled credit obligations and completed assignments apart from the Edgenuity program. Because Ms. Dowling did not develop this evidence, she cannot

---

[30] *See* Doc. 30-1, pp. 73-74 for an explanation of the way in which the school district used Edgenuity to assist students who failed courses and had to retake them to recover credit.

establish error in the IHO's factual findings regarding R.E.'s coursework during the four weeks he spent at Colt Academy.[31]

The IHO did not specifically address Ms. Dowling's argument concerning the implementation of R.E.'s IEP after he moved from Colt Academy to the custody of Alabama's Department of Youth Services in January 2016. The DYS placed R.E. at the McNeel School in Tuscumbia, a city in Colbert County, Alabama. The Limestone County Board did not have to provide R.E.'s free public education while he attended a program in another county. Under Alabama law, for "children with disabilities who are not residing with their parents or who are enrolled in a program outside the jurisdiction of their residence, the following rules apply:"

> (a) For children with disabilities who have been determined to be wards of the State or who reside in group homes, detention facilities, nursing homes, and private facilities, it is the responsibility of the LEA where the facility is located to ensure that FAPE is made available. This rule applies to students with disabilities who are incarcerated in local city and county jails.

---

[31] Ms. Dowling asked Ms. Bachus whether she could provide documentary evidence that established that R.E. had access to Edgenuity while he attended Colt Academy. (Doc. 30-1, p. 60). Ms. Bachus stated that the reports were available, and the Board's attorney offered to place the reports in the record. (Doc. 30-1, p. 61). Ms. Bachus explained that "[a]nytime [R.E.] was in the program, [the Board had] a report from which courses were assigned and how much percent that [R.E.] completed." (Doc. 30-1, p. 62). Ms. Dowling objected to Ms. Bachus's testimony because the Board did not produce the reports before the administrative hearing. The IHO instructed Ms. Dowling that she had to allow the Board to introduce the reports if she wanted to explore R.E.'s work in Edgenuity; Ms. Dowling withdrew her question. (Doc. 30-1, p. 62). Ms. Dowling also requested work samples which the Board did not produce. Those work samples may have shed light on the coursework that R.E. completed during his brief stay at Colt Academy, but testimony from R.E.'s special education teacher at Colt Academy or from Ms. Bachus about the Edgenuity reports would have supplied the best evidence of R.E.'s coursework. The Court recognizes that Ms. Dowling is not an attorney, and the Court does not criticize Ms. Dowling's work on behalf of her son, but Ms. Dowling cannot demonstrate error on the record before the Court.

> This rule does not apply to students with disabilities who are
> incarcerated in adult correctional facilities under the Department
> of Corrections.

ALA. ADMIN. CODE R. 290-8-9-.10(1)(a).  Therefore, the Board was not responsible

for R.E.'s access to FAPE after he moved from Colt Academy to the program in

Colbert County.

*2016-2017 IEP*

Ms. Dowling argues that during the month of August of 2016 while R.E.

participated in Limestone County's Success Academy program, the Board violated

the LRE requirement in R.E.'s IEP which required instruction in the regular

education setting for 80-100% of the day.  (Doc. 53, p. 35).  Ms. Dowling contends

that after the August 31, 2016 indecent exposure incident which led to R.E.'s

expulsion, R.E. had no placement, and R.E. received no special education other than

access to Edgenuity.  (Doc. 53, pp. 36-37).  Ms. Dowling argues that following his

expulsion, R.E.'s Limestone County IEP team should have placed him in the

district's Alternative School with other non-disabled students rather than in a

conference room at the Sheriff's Department.  (Doc. 53, p. 38).

Turning first to the alleged LRE violation in August of 2016, the IHO found,

with little explanation, that R.E.'s placement at Success Academy complied with the

LRE in his 2016-17 IEP.  (Doc. 30-4, p. 15).  The LRE in the 2016-17 IEP that the

McNeel School developed in May 2016 and R.E.'s Limestone County IEP team

adopted in July 2016 required R.E. to receive instruction with his non-disabled peers for at least 80% of the school day.  (Doc. 30-55, p. 11; *see* Doc. 30-1, p. 79 (Ms. Bachus's testimony that the Limestone County IEP team began the 2016-17 school year using the IEP that the McNeel School developed); Doc. 30-1, p. 85 (testimony regarding July 28, 2016 IEP team meeting to review the McNeel-developed IEP for the 2016-17 school year); Doc. 30-57 (notes from July 28, 2016 team meeting)).[32] R.E.'s Limestone County IEP team placed him in the district's Success Academy program to begin the new school year.  (Doc. 30-57, p. 2).  While he participated in the Success Academy program, R.E.'s base school was West Limestone High School, but he attended classes in the Success Academy program at the district's Career Tech Center.  (Doc. 30-1, pp. 85-88, 97-99, 109; Doc. 30-57).  Success Academy is an 80-100 LRE.  (Doc. 30-1, pp. 86-88, 109-110; *see* Doc. 30-55, p. 11).

The evidence regarding R.E.'s actual participation in the Success Academy program is confusing.  R.E.'s records shed some light on the nature of his work in the Success Academy program.  Notes from the July 28, 2016 IEP team meeting describe the Success Academy program as "Blended Virtual Learning."  (Doc. 30-57, p. 2).  Notes from an August 30, 2016 IEP team meeting explain that the team, which included a special education teacher and a general education teacher, met at

---

[32] At the administrative hearing, Ms. Dowling stated that she did not consent to the August 30, 2016 amendment to R.E.'s IEP.  (Doc. 30-1, p. 242).

the Career Tech Center to "discuss[] [R.E.'s] behavior and progress [at] Success." (Doc. 30-58, p. 16). The team conducted a functional behavioral assessment of R.E. and developed a behavior intervention plan for him. (Doc. 30-1, pp. 101-02; Doc. 30-58, pp. 13-15).[33] The team stated that R.E.'s behavior "impact[ed] his academic learning and participation in academic computer based program." (Doc. 30-58, p. 13). The team stated that R.E.'s "inappropriate behaviors" affected his learning and "disrupt[ed] the educational process of other students." (Doc. 30-58, p. 13). The team's assessment was based, in part, on "Edgenuity Sessions Logs/Grades." (Doc. 30-58, p. 15). During the August 30, 2016 meeting, the team amended R.E.'s IEP to provide "grade-level face-to-face specialized instruction in the home setting utilizing the online academic learning program, Edgenuity, three days a week, one hour each day," (Doc. 30-58, p. 2; *see also* Doc. 30-58, p. 5). In the August 30, 2016 amended IEP, the space for detailed LRE information is blank. (Doc. 30-58, p. 11). Thus, through August 30, 2016, R.E.'s records indicate that he was studying in a classroom setting with other students, at least one general education teacher, and a special education teacher; that he was using a computerized program for at least

---

[33] The functional behavior assessment appears in the record with documents from the August 30, 2016 team meeting, (Doc. 30-58), but the assessment document is undated, (Doc. 30-58, pp. 13, 15). A similar assessment form appears with records from the September 27 team meeting, and that assessment form is dated September 27, 2016, (Doc. 30-59, p. 11). Ms. Bachus testified that the IEP team did conduct a functional behavioral assessment on August 30, 2016. (Doc. 30-1, pp. 101-02).

some of his coursework; and that he was working at home with a homebound teacher three hours per week.  If the IEP team reduced R.E.'s LRE at the August 30, 2016 meeting, the team omitted the information from R.E.'s amended IEP.

Testimony from the administrative hearing sheds little light on the amount of time R.E. spent in a classroom with other students in August 2016 while he participated in the Success Academy program.  Ms. Dowling explained, and Ms. Bachus confirmed, that during the July 2016 IEP meeting, Ms. Dowling expressed concern about R.E.'s credit recovery.  (Doc. 30-1, p. 85).  At the July 2016 meeting, the IEP team did not add homebound services to address credit recovery, (Doc. 30-1, p. 86); the team added those services on August 30, 2016 to supplement the credit recovery that R.E. was pursuing in the Success Academy program, (Doc. 30-1, pp. 87-91, 95, 101-02).  The homebound services, as noted, were three hours per week, and those homebound services were in addition to "school-day services" and credit recovery through Edgenuity.  (Doc. 30-1, p. 87).  Ms. Bachus stated that the IEP team just added services on August 30 and did not change R.E.'s placement.  (Doc. 30-1, p. 102).  But Ms. Bachus also testified that students could participate in the Success Academy program for half of a school day or an entire day.  She stated: "we decided on the half day" Success Academy program with "additional services" through the Edgenuity program that was available to students all day.  (Doc. 30-1, pp. 86-87, 91; *see also* Doc. 30-56, p. 1).  But she also stated R.E. "was in an 80 to

76

100 percent environment with face-to-face teachers, intervention, anything he needed.  And then he got the homebound services in addition to that for credit recovery." (Doc. 30-1, p. 88).

As noted, the IHO credited Ms. Bachus's testimony that R.E. was in an 80-100 LRE through the end of August 2016.  There is not sufficient evidence to overturn that credibility finding.  Although Ms. Dowling mentioned a half-day program, and Ms. Bachus mentioned an agreement that R.E. would work in the Success Program half days, the evidence does not indicate whether the parties reached that agreement during the July 2016 meeting, the August 2016 meeting, or at some other point.  The record demonstrates that R.E. was in a classroom with other students long enough each day in August 2016 to disrupt those students' studies and require a behavior modification plan.  Without better-developed evidence, the Court, giving due deference to the IHO's factfinding, will not override the finding.[34]

Even if there were clear evidence that, during the month of August 2016, R.E. was in a classroom with other students less than 80% of the day, under Eleventh Circuit precedent, the error would not rise to the level of an IDEA violation.  The record establishes that during the month of August 2016, R.E. was in a classroom

---

[34] Ms. Dowling's attorney could have requested an evidentiary hearing to develop this information in a supplemental record.  Her attorney did not exercise that option.

with other students for at least half the school day.  August 1, 2016 was the first day of school for the Cherokee County School District. *CHEROKEE COUNTY SCHOOL DISTRICT 2016-2017 SCHOOL YEAR CALENDAR*, http://www.cherokeek12.net/userfiles/wp-uploads/2016/04/2016-17Calendar.pdf (last visited Nov. 30, 2022).  Thus, for a total of 21 school days, (August 1 – August 30), at most, R.E. was not in the classroom with other students for a total of approximately 63 hours, which equates to approximately 8 school days in which he was not in LRE over the course of the academic year.  This is not a "material implementation failure" because the Board did not fail to implement a substantial or significant part of R.E.'s 2016-17 IEP.

As for R.E.'s lack of placement after the August 31, 2016 indecent exposure incident, the record demonstrates that for most of the period between August 31 and November 1, R.E. was hospitalized.  R.E. was admitted at Hill Crest Hospital for much of the month of September.  (Doc. 30-64, p. 4).  R.E. "was admitted to Mountainview for approximately one week in October.  He was then admitted to Athens Hospital the day before Thanksgiving and transferred to Decatur General. He was released from Decatur West in December."  (Doc. 30-64, p. 4).  The record demonstrates that through at least part of this period, Ms. Dowling would not communicate with Ms. Bachus or with R.E.'s behavior counselor.  (Doc. 30-64, p.

9). There is no evidence that the Board's employees knew where to find R.E. during at least some of his hospitalizations.

R.E.'s IEP team did meet on September 27, 2016 for a manifestation determination relating to the August 31 incident. (Doc. 30-60). An individual from Hill Crest provided information to the team a few days before the meeting, and notes from the meeting indicate that Hill Crest released R.E. on September 22. (Doc. 30-59, pp. 10, 14). The team reduced R.E.'s LRE to 40% and discussed a reevaluation. (Doc. 30-59, pp. 10, 15). In January of 2017, following R.E.'s expulsion, the team arranged for R.E. to receive one-on-one homebound services with his homebound teacher in a conference room at the Limestone County Sheriff's Department in January 2017. (Doc. 30-64, p. 4). R.E. returned to Hill Crest on February 27, 2017 and was there through at least the end of March 2017 when R.E.'s IEP team was able to complete his reevaluation. (Doc. 30-64, p. 4). Ms. Bachus testified that while R.E. was in acute care at Hill Crest Hospital, his IEP team provided services to him, working with and training the special education teachers at Hill Crest to help R.E. complete coursework through Edgenuity. (Doc. 30-1, pp. 264-65). After R.E. moved to the residential side of the hospital, he withdrew from the Limestone County school district, and the hospital became responsible for his IEP and his education. (Doc. 30-1, pp. 243, 264-66).

R.E.'s hospitalizations made it impossible for his IEP team to meet his LRE requirements, and Ms. Dowling's refusal to communicate with key members of R.E.'s IEP team similarly frustrated the team's ability to meet R.E.'s LRE and FAPE requirements.  Under these circumstances, Ms. Dowling cannot establish an LRE violation.  *Loren F.*, 349 F.3d at 1312-13.

Finally, as to the decision to educate R.E. at the Limestone County Sheriff's Department in January of 2017 rather than the Alternative School, the record demonstrates that after the district's disciplinary committee expelled R.E. early in November 2016, he could not be on a school campus "at all."  (Doc. 30-1, pp. 128-29; *see* Doc. 30-62, p. 9).  Therefore, he could not attend the Alternative School because the school was on a Limestone County school campus.  The IEP team's failure to amend R.E.'s IEP on November 1, 2016 to reflect his expulsion is a technical violation of the IDEA that does not afford Ms. Dowling grounds for relief.  Ms. Dowling received written notice from the Board's disciplinary committee that R.E. was expelled from Limestone County schools for the balance of the 2016-17 school year and that he could not "be present on the campus of any Limestone County school . . . during the 2016-17 school year."  (Doc. 30-62, p. 9).  Though R.E.'s IEP team should have amended his 2016-17 IEP to reflect the change in placement, the error does not rise to the level of an IDEA violation that supports a claim for relief.  *L.J. by N.N.J.*, 927 F.3d at 1211.

*R.E.'s 2016-17 Reevaluation*

In her complaint, Ms. Dowling alleged that the Board "failed to complete a full, individualized, and comprehensive evaluation prior to R.E.'s MDR on September 27, 2016 or anytime before March 27, 2017." (Doc. 1, p. 35). Ms. Dowling asserted that had R.E. been reevaluated before September of 2016, his primary disability would have changed from SLD to Emotional Disability, and the indecent exposure incident on August 31, 2016 would have been deemed a manifestation of his disability during the September 27, 2016 MDR. (Doc. 1, p. 36). As a result, the Board would not have been able to expel R.E., causing R.E. to be deprived of a FAPE during the 2016-17 school year. (Doc. 1, p. 36). The IHO found that this argument lacked evidentiary or legal support. (Doc. 30-4, p. 27). In her brief in opposition to the Board's motion for judgment on the record, Ms. Dowling argues that in September 2016, "R.E.'s IEP team did not properly consider all relevant information before making its MDR decision." (Doc. 53, p. 19).

Examination of the timing of R.E.'s 2016-17 reevaluation, especially as it relates to the September 2016 MDR, requires careful adherence to the standards that district courts must follow when reviewing administrative proceedings. Relying on hindsight, Ms. Dowling invites the Court to isolate information in the record concerning R.E.'s increasingly disruptive behavior and his mental health diagnoses and conclude that his Limestone County IEP team should have decided before

September 2016 to reevaluate him to determine whether SLD still was his primary learning disability.[35]  But the Court must view the relevant evidence in context and must heed the admonition that a district court "'must be careful not to substitute its judgment for that of the state educational authorities.'"  *R.L.*, 757 F.3d at 1178 (quoting *Walker Cnty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000)); *Rowley*, 458 U.S. at 206 (stating that the "provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review").

In context, it is undisputed that after R.E.'s triennial reevaluation at The Bridge in May of 2015, his Limestone County IEP team was not statutorily obligated to conduct another triennial reevaluation until May of 2018.  20 U.S.C. § 1414(a)(2)(B)(ii).  As noted, a district ordinarily should not reevaluate a student more than once per year.  20 U.S.C. § 1414(a)(2)(B)(i).  Therefore, the earliest R.E.'s Limestone County IEP team likely would have considered him for reevaluation was May of 2016.  But R.E. left the Limestone County school district in January 2016, (Doc. 30-1, pp. 63-64; Doc. 30-20), and he did not re-enroll in the district until June 2016.  Per the rule that a school district must conduct a reevaluation if the agency

---

[35] It is undisputed that an IEP team may identify only one primary learning disability for a student. In addition to the primary disability, a team may identify other areas in which a student needs support and include, in an IEP, tools and action items to address those needs.

determines that a student's educational needs "warrant a reevaluation" or "if the child's parents or teacher requests a reevaluation," 20 U.S.C. § 1414(a)(2)(A), R.E.'s IEP team began the reevaluation process in September 2016 when Ms. Dowling and R.E.'s IEP team agreed that he needed a new evaluation. (Doc. 30-64, p. 9). Thus, in context, Ms. Dowling asks whether R.E.'s IEP team should have reevaluated him to determine whether SLD still was his primary learning disability in July of 2016 when R.E. participated in a remote summer program or in August of 2016 during his first month at Success Academy.[36]

"The salient question here is whether [Limestone County] was on notice" in July or August of 2016 "that the circumstances warranted a reevaluation." *Phyllene W.*, 630 Fed. Appx. at 924. The criteria for Emotional Disability shed light on the types of circumstances that might warrant a reevaluation. Under ALA. ADMIN. CODE r. 290-8-9-.03(4), "Emotional Disability means a condition exhibiting one or more

---

[36] It is undisputed that R.E.'s learning has been compromised by his poor reading skills. It is undisputed that those poor skills have impacted R.E.'s learning in all subject matters. (Doc. 30-15, p. 2). It also is undisputed that Limestone County took steps to address R.E.'s behavior from 2012 through 2016. (Doc. 30-13, p. 2; Doc. 30-14, pp. 8, 11; Doc. 30-16, p. 5; Doc. 30-17, p. 6; Doc. 30-25, pp. 10, 12, 14-18; 30-54, p. 13; Doc. 30-55, p. 9). It is undisputed that an IEP team may identify only one primary disability in an evaluation. Based on the reevaluation which R.E.'s IEP team began in September of 2016 and completed in March of 2017, the team concluded that R.E. met the "criteria for Intellectual Disability, OHI for ADHD, as well as Emotional Disability." (Doc. 30-64, p. 7). OHI stands for "Other Health Impairment." *Other Health Impairment (OHI)*, ALA. PARENT EDUC. CTR., http://alabamaparentcenter.com/web/wp-content/uploads/2019/11/Special-Education-V.23-Other-health-Impairment.pdf (last visited Nov. 30, 2022). The team reported that, "at this time, [R.E.'s] adverse affect in the classroom can best be explained by Emotional Disability, and the team feels that this category is the best that encompasses [R.E.'s] needs at this time." (Doc. 30-64, p. 7). Ms. Dowling contends that the Board should have determined sooner that R.E.'s emotional disability was his primary disability.

of" several characteristics "over a long period of time and to a marked degree that adversely affects a child's educational performance."  ALA. ADMIN. CODE r. 290-8-9-.03(4) (2013).  The characteristics include:

1. An inability to learn that cannot be explained by intellectual, sensory, or health factors;

2. An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

3. Inappropriate types of behavior or feelings under normal circumstances;

4. A general pervasive mood of unhappiness or depression; or

5. A tendency to develop physical symptoms or fears associated with personal or school problems. Emotional disability includes schizophrenia. The term does not include children who are socially maladjusted, unless it is determined that they have an emotional disability as defined herein.

ALA. ADMIN. CODE r. 290-8-9-.03(4)(a) (2013).[37]

---

[37] Alabama's regulation concerning "Emotional Disability" also provides:

(b) Criteria.

1. Evidence that vision/hearing screening results are satisfactory prior to proceeding with evaluations.

2. Evidence that the problem is not due to intellectual, sensory, or health factors.

3. Standard scores (total or composite) on two out of three of the same norm-referenced behavior rating scale must be at least two standard deviations above or below the mean (70, depending on the rating scale). Ratings from three or more scales will be obtained from at least three independent raters, one of whom may be the parent or the child through a self-report.

4. Evidence that the emotional disability adversely affects the child's academic performance and/or social/emotional functioning in the school environment.

———————————————

5. Evidence that the emotional disability is exhibited over a long period of time (typically six months) and to a marked degree, and that the child's educational performance is adversely affected.

6. Observational data that documents the emotional disability in two or more educational settings.

(c) Minimum Evaluative Components.

1. Vision/hearing screening.

2. Individual intellectual evaluation.

3. Administration of three of the same norm-referenced behavior rating scale by three or more independent raters who have had knowledge of the child for at least six weeks. One of the raters may be the parent or the child. If a self-report is used, it must be a version of the same behavior rating scale.

4. Individual educational achievement evaluation and a statement of how the impairment adversely affects the child's academic performance and/or the child's social/emotional functioning.

5. Documentation that the emotional disability is exhibited over a long period of time (typically six months) to a marked degree that adversely affects educational performance. Documentation must include teacher, parent and/or child interview(s); documentation of environmental, socio-cultural, and/or ethnic information (e.g., Environmental, Cultural and Economic Concerns checklist); and at least one of the following:

(i) Observation of the child in an educational environment other than the required observation.

(ii) Counselor reports.

(iii) Language evaluation.

(iv) Anecdotal records from classroom teacher(s) or other LEA personnel.

(v) Documentation may also include at least one of the following, if available:

(I) Clinical psychological/psychiatric reports.

(II) School psychologist reports.

(III) Medical reports.

6. Observation by a qualified professional in two or more educational settings (one structured setting and one unstructured setting).

Given that definition of "Emotional Disability," the relevant circumstances following R.E.'s May 2015 triennial reevaluation are these:  R.E.'s Bridge IEP indicated that that his behavior improved while he was in the Bridge program, (Doc. 30-48, p. 2), so successful drug treatment and counseling seemed to mitigate at least some of his behavior issues.  In August 2015, when R.E.'s Limestone County IEP team reviewed the three-year evaluation and IEP from the Bridge, his team amended his IEP to reflect that he had a behavior that impeded his learning or the learning of others, to add services from a behavior teacher for 30 minutes two times each week, and to "address the appropriate times the behavior teacher will provide intervention for [R.E.]."  (Doc. 30-48, pp. 1, 3-4; *see also* Doc. 30-54, p. 2).

When R.E.'s IEP team conducted an MDR in September of 2015, the team learned that R.E. was "going through changes in medication," and his mental health provider was evaluating him for mood disorders.  (Doc. 30-51, p. 1).  R.E. had failing grades, and he had been suspended for a total of five days.  (Doc. 30-51, p. 1).  He had student conduct infractions for a cell phone violation, slapping another student during class, not bringing books to class, revealing his nipple, showing disrespect when corrected, playing inappropriate video games in class, and refusing to surrender his device and take his seat.  (Doc. 30-54, pp. 2-3).  After the district placed

---

ALA. ADMIN. CODE r. 290-8-9-.03(4) (2013).

R.E. in the Alternative School to discipline him for the gun remark, his IEP team placed him at Colt Academy to provide intensive behavior support. A few weeks later, R.E. left the district to attend the McNeel School at the direction of Alabama's Department of Youth Services and did not return until June 2016. On August 30, 2016, R.E.'s IEP team conducted a functional behavior assessment and added behavior supports. (Doc. 30-1, p. 107; Doc. 30-58, pp. 13-16).

None of these circumstances caused R.E.'s IEP team to call for a reevaluation in July or August of 2016 or at any time between his May 2015 reevaluation at the Bridge and the reevaluation that his Limestone County IEP team began in September 2016. This evidence shows that between May 2015 and September 2016, R.E.'s Limestone County IEP team was escalating its efforts to address his behavior, and the team was collecting information that would support a finding of Emotional Disability under ALA. ADMIN. CODE r. 290-8-9-.03(4)(a). Still, the Court does not believe this evidence permits the Court to second-guess the Limestone County IEP team's failure to call for a reevaluation of R.E. in July 2016 or August 2016.

Two main factors lead the Court to this conclusion. First, as noted, R.E. was not enrolled in a school in the Limestone County district for six of the 16 months between May 2015 and September 2016. Three of the months R.E. was enrolled in the Limestone County school district were summer months when R.E. was not in a regular classroom. Between May 2015 and August 2016, R.E. attended three

different schools in the Limestone County district. When R.E. began the 2016-17 school year, his academic and behavior teachers at Success Academy had one month to observe him and to determine the extent to which his behavior was rooted in an emotional disturbance as opposed to an effort to avoid classwork and assignments.[38]

Second, R.E.'s Limestone County IEP team was not alone in attributing much of R.E.'s misbehavior to task avoidance rather than an emotional disability. In May 2015, R.E.'s IEP team at the Bridge wrote that R.E. was "very polite and respectful to his teachers." (Doc. 30-15, p. 1). The team indicated that R.E.'s behavior improved at The Bridge. (Doc. 30-15, p. 1). After several months at the McNeel School, in May of 2016, R.E.'s IEP team at that school wrote in his 2016-17 IEP that "[d]espite the altercations, the team does not feel that he is a behavior problem." (Doc. 30-55, p. 1; *see also* Doc. 30-55, p. 3 (indicating that R.E. did not have a

---

[38] Zooming out from the 15-month period between May 2015 and September 2016, while R.E. was enrolled in the Limestone County school district, his IEP team had only one complete academic year in which to work with him. That was the 2012-13 academic year. After that, early in the 2013-14 school year after the district disciplined R.E., Ms. Dowling removed him from the district and homeschooled him. When R.E. returned to the district for the 2014-15 school year, after R.E. began to struggle with behavioral problems and the district disciplined him, Ms. Dowling removed R.E. from the district for drug treatment at the Bridge. R.E. attended school in the district during the 2015 fall semester, but he left the district again for the 2016 spring semester. Moreover, when R.E. returned to the district in the fall of 2014, the fall of 2015, and the fall of 2016, Ms. Dowling asked the district to place R.E. in different high schools, and the district complied. R.E. attended Elkmont in the fall of 2013, Tanner High School in 2014-15, West Limestone in 2015-16, and East Limestone in 2016-17. As a result, R.E.'s special education teacher and his behavior teacher changed annually as did his subject matter teachers. The Court does not criticize Ms. Dowling for the choices that she made as she tried diligently to give R.E. the support he needed, but the Court recognizes that the lack of consistency undermined the district's ability to assess R.E. over an extended period of time.

behavior that impacted his learning or the learning of other students)).  The team wrote that R.E. was capable but easily distracted and needed redirection.  (Doc. 30-55, p. 1).  The team stated:  "Care has to be taken because [R.E.] does try to convince staff that he is unable to complete certain assignments."  (Doc. 30-55, p. 1).  The McNeel IEP team conducted a functional behavioral assessment and concluded that R.E.'s behavior was not a significant concern.  The team reported that R.E. engaged in horseplay in class when he was around other students engaged in horseplay, and he misbehaved to get attention from his peers.  The team reported that R.E. responded positively to redirection, and the impact of the horseplay on his learning was "very minimal."  (Doc. 30-55, pp. 12-13).  The team noted that R.E. struggled with frustration.  (Doc. 30-55, p. 13).  The McNeel IEP team designated the behavioral services that R.E.'s Limestone County IEP team designated when it amended R.E.'s 2015-16 IEP.  (Doc. 30-55, p. 9; *see* Doc. 30-54, p. 10).

The Bridge report and the McNeel report are significant to the Court's analysis.  R.E.'s Limestone County IEP team could rely on these reports when deciding whether R.E. required a reevaluation.  These reports confirmed Limestone County's overall experience with R.E. – he behaved better when he was in an environment other than a regular classroom.  If the Court were to find error in the Limestone County's IEP team's assessment that SLD was R.E.'s primary disability through the fall of 2016, the Court effectively would substitute its judgment for that

of state educational authorities in three separate school districts, all of whom independently assessed and educated R.E.  The law does not permit the Court to do so.  *R.L.*, 757 F.3d at 1178; *Rowley*, 458 U.S. at 206.[39]

For these reasons, the Court finds that the Board did not violate the IDEA by waiting until September 2016 to begin a reevaluation of R.E.  R.E.'s Limestone County IEP team properly relied on the finding that SLD was R.E.'s primary disability when the team conducted R.E.'s MDR in September 2016

## V.

### *The Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Due Process*

In her amended complaint, Ms. Dowling presented several grounds for relief under § 504, the ADA, and the Due Process Clause.  (Doc. 28, pp. 4-35).  She opposed the Board's summary judgment motion with respect to only two of those grounds, her claims regarding the Board's failure to provide R.E. access to a traditional summer school program in 2016 and her claims regarding the Board's

---

[39] The Court notes that R.E.'s drug use complicated assessments of R.E.'s behavior.  Multiple records indicate that R.E.'s classroom behavior was much better when he was compliant with his medication for ADHD, but his doctors had trouble adjusting his medication because of his use of unprescribed drugs.  R.E.'s case is complex, making the Court particularly reluctant to substitute its judgment for specialists in drug treatment like the professionals at The Bridge and specialists like the professionals at the McNeel School. The assessments by R.E.'s Limestone County's IEP team in 2015 and 2016 were consistent with the assessments provided by R.E.'s IEP teams at The Bridge and at the McNeel School.  Armed with the information from The Bridge and the McNeel School, R.E.'s IEP team likely would not have changed his primary disability designation in July 2016 or August 2016 had the team reevaluated R.E. at that time.  The change in designation followed R.E.'s series of hospitalizations in the fall of 2016.

inadequate procedures concerning R.E.'s expulsion hearing.  (Doc. 53, pp. 39-45).
The Court considers Ms. Dowling's other § 504, ADA, and constitutional claims
abandoned.  *Resol. Tr. Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995)
("There is no burden upon the district court to distill every potential argument that
could be made based upon the materials before it on summary judgment. *Blue Cross
& Blue Shield v. Weitz,* 913 F.2d 1544, 1550 (11th Cir.1990). Rather, the onus is
upon the parties to formulate arguments; grounds alleged in the complaint but not
relied upon in summary judgment are deemed abandoned.").

"Discrimination claims under the ADA and the Rehabilitation Act are
governed by the same standards, and the two claims are generally discussed
together."  *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d
979, 985 (11th Cir. 2017) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir.
2000)).

> To state a claim under Title II and § 504, a plaintiff must demonstrate
> "(1) that he is a qualified individual with a disability; (2) that he was
> either excluded from participation in or denied the benefits of a public
> entity's services, programs, or activities, or was otherwise
> discriminated against by the public entity; and (3) that the exclusion,
> denial of benefit, or discrimination was by reason of the plaintiff's
> disability."

*J.S., III*, 877 F.3d at 985 (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083
(11th Cir. 2007)).

The Eleventh Circuit Court of Appeals has explained "that '[t]o prove discrimination in the education context, something more than a mere failure to provide the free appropriate education required by [IDEA] must be shown[.]'" *J.S., III*, 877 F.3d at 985 (quoting *Sellers v. Sch. Bd. of City of Mannassas, Va.*, 141 F.3d 524, 529 (4th Cir. 1998)) (internal quotation marks omitted). A plaintiff must prove a school board's intentional discrimination, and a plaintiff may do so by demonstrating that the school board was deliberately indifferent to a student's needs. *J.S., III*, 877 F.3d at 987 (citing *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 347-48 (11th Cir. 2012)). "Deliberate indifference is an exacting standard; school administrators will only be deemed deliberately indifferent if their response … or lack thereof is clearly unreasonable in light of the known circumstances." *J.S., III*, 877 F.3d at 987 (quoting *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1259 (11th Cir. 2010)).

With respect to her summer school allegation, Ms. Dowling contends that the Board denied R.E. access to the general education summer school program at Tanner High School in the summer of 2016 because of his disability in violation of § 504 of the Rehabilitation Act and the ADA. (Doc. 53, pp. 39-43). The record indicates that, following his semester at the McNeel School, R.E.'s Limestone County IEP team met on June 15, 2016, discussed several courses in which R.E. had received only partial credit, and decided that R.E. should receive homebound instruction

summer services for six hours per week using Edgenuity. (Doc. 30-56, p. 1). The team noted that over the summer, R.E. was providing community service through JPO and indicated that R.E.'s 2016-17 IEP was amended to reflect the assigned homebound summer services.[40] Ms. Dowling argues that through this placement, R.E. "was denied the benefit of the inclusive environment and quality of the Summer School Program" at Tanner High School "and accompanying accommodations, supplementary aids and services, and/or related services." (Doc. 53, p. 43).

Relying on *Durbrow v. Cobb County School District*, the Board posits that Ms. Dowling essentially argues that R.E. was denied a FAPE during the summer of 2016, and Ms. Dowling "cannot circumvent IDEA's exhaustion requirement by alleging a FAPE deprivation under the guise of a different federal statute." (Doc. 45-1, p. 21) (citing *Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1190 (11th Cir. 2018)); *see Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 754-55 (2017). The Court agrees that Ms. Dowling's theory concerns the denial of FAPE. Ms. Dowling effectively contends that R.E. was deprived of the 100-80% LRE in his 2016-17 IEP during the summer of 2016; that is "the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint." *Fry*, 137 S. Ct. at 755. But Ms. Dowling exhausted the claim because she raised the summer school issue in her administrative complaint,

---

[40] Though amendment of R.E.'s 2016-17 IEP is noted in the conference record for the June 15, 2016 IEP meeting, the amendment does not appear in R.E.'s amended 2016-17 IEP. (Doc. 30-56; Doc. 30-58).

(Doc. 30-2, pp. 24-25), and she addressed concerns about R.E.'s 2016 summer placement at the administrative hearing, (Doc. 30-1, pp. 232-35).  Though Ms. Dowling exhausted her claim regarding R.E.'s placement during the summer of 2016, her claim fails for other reasons.[41]

Ms. Dowling's § 504 and ADA claims based on R.E.'s placement during the summer of 2016 fail because Ms. Dowling produced no evidence that Limestone County provided homebound services to R.E. over the summer to discriminate against him based on his learning disability.  In her administrative complaint, Ms. Dowling asserted that "there was no legitimate reason to keep [R.E.] from attending Tanner" during the summer of 2016.  (Doc. 30-2, p. 25).  The evidentiary record contradicts the assertion.  The record indicates that the summer school program for which R.E. applied lasted 18 school days between June 6, 2016 and June 29, 2016. (Doc. 30-22, p. 2).  The application deadline for the program was May 27. 2016; registration was June 1, 2016.  (Doc. 30-22, p. 10, ¶ 12). R.E. did not apply for the program until June 6, 2016, the day the program began.  (Doc. 30-22, pp. 2-3).  The summer school program guidelines state that daily attendance in the program was mandatory, and any student who missed "eight (8) or more hours . . . for any reason" would be "withdrawn from the course without credit."  (Doc. 30-22, p. 7, ¶ 4).  Thus,

---

[41] The IHO did not discuss R.E.'s 2016 summer placement in the administrative decision.  (Doc. 30-4).

because of his late registration, it is not clear that R.E. would have been able to receive credit had he attended Tanner High School's summer program.[42]

On his application for the summer program at Tanner High School, R.E. indicated that he wished to pursue credit recovery in World History and English through the summer school program. (Doc. 30-22, p. 3). Courses in the summer program were online through Edgenuity. (Doc. 30-22, pp. 7-8, ¶¶ 6, 8). The summer services that R.E. received were through Edgenuity. (Doc. 30-56, p. 1).

R.E.'s Limestone County IEP team learned that he had been released from DYS custody sometime between June 6, 2016 and June 9, 2016. (Doc. 30-56, p. 3). After providing notice on June 9, 2016, R.E.'s IEP team convened on June 15, 2016 to discuss his summer placement. (Doc. 30-56). The IEP team provided R.E. homebound services for the balance of the summer. True, the summer homebound placement was inconsistent with the LRE in R.E.'s original 2016-17 IEP, but the homebound placement gave R.E. a longer period to pursue course credits and

---

[42] The summer school program guidelines also state that the program was "limited to students enrolled in the Limestone County School system in Grades 7-12." (Doc. 30-22, p. 7, ¶ 3). In January 2016, when R.E. was placed in the custody of the Department of Youth Services and assigned to the McNeel School, he was withdrawn from the Limestone County school system. (Doc. 30-20). Ms. Dowling acknowledged that she did not attempt to reenroll R.E. in the Limestone County school district before he applied for the summer program at Tanner High School; she stated that she did not understand why R.E. had been withdrawn from the Limestone County school system, and she did not re-register R.E. in the system until two days before he began the fall 2016 semester at Success Academy. (Doc. 233-34). The counselor who evaluated R.E.'s application for the Tanner High School summer program rejected the application because R.E. was not enrolled in the Limestone County school district. (Doc. 30-22, p. 2; *see also*, Doc. 30-1, pp. 232-33).

maximized his opportunity to recover credits for more than one course.  (Doc. 30-22, p. 9, ¶ 10 (explaining that students had to complete courses in the Tanner summer program one at a time and that most students would have time to complete only one course).  The summer services also accommodated R.E.'s community service through JPO.  (Doc. 30-56).

Thus, the record does not indicate that R.E.'s IEP team was deliberately indifferent to R.E.'s needs or that the team selected R.E.'s summer placement to discriminate against him based on his disability.  His Limestone County IEP team selected a summer placement that increased his chances of successfully recovering course credit before the fall semester began, and R.E. used the same online services from home that he would have used had he attended the 18-day program at Tanner High School.  Because the record contains no evidence of discriminatory intent with respect to R.E.'s placement during the summer of 2016, the Court will enter judgment for the Board on Ms. Dowling's § 504 and ADA claims based on the placement.

Though Ms. Dowling argues briefly that her claim regarding the notice she received for the hearing on R.E.'s sexual offense charge may be resolved under § 504 and the ADA, (Doc. 53, p. 45), the gist of Ms. Dowling's claim concerns the Board's alleged violation of the Due Process Clause in the Fourteenth Amendment, (Doc. 53, p. 44).  Ms. Dowling contends that the Board's notices lacked specificity

about the charge against R.E., and the Board did not identify the witnesses who would testify at the hearing or provide copies of reports that might be used as evidence against R.E.   (Doc. 53, p. 44).   The record, viewed in the light most favorable to Ms. Dowling, does not support the alleged constitutional violation.

The district superintendent addressed four written notices to Ms. Dowling for R.E.'s hearing before the disciplinary hearing.   The notices are dated September 27, 2016, September 30, 2016, October 18, 2016, and October 20, 2016.   (Doc. 30-62, pp. 1-8).   Two of the notices state:   "The specific charges are as follows:   Student Handbook - 3.07 Sexual offense or harassment."   (Doc. 30-62, pp. 1, 3) (underline in notice).   Two state:   "The specific charge for possible expulsion is:   Student Handbook - 3.07 Sexual offense or harassment."   (Doc. 30-62, pp. 5, 7) (underline in notice).   The notices stated that Ms. Dowling could select either a public or private hearing, bring witnesses to testify on R.E.'s behalf, cross-examine witnesses who testified against R.E., have an attorney attend to represent R.E., and present physical evidence or written documentation.   The notices indicated that R.E. could testify if he chose to.   (Doc. 30-62, pp. 1-8).   The notices identified one witness by name and indicated that the disciplinary committee would call other witnesses "as deemed appropriate."   (Doc. 30-62, pp. 2, 4, 6, 8).   Handwritten notes on the second notice indicate that someone reviewed the notice with Ms. Dowling, and Ms. Dowling indicated that she preferred a private hearing and that R.E. would not attend the

hearing. (Doc. 30-62, pp. 3-4). Ms. Dowling signed the second notice. (Doc. 30-62, p. 4).

In the fourth notice dated October 20, 2016, the superintendent explained that the disciplinary committee had convened on October 19, 2016 to consider the charge against R.E. and the recommendation of expulsion. The superintendent wrote that, "[d]ue to the seriousness of the charges," the committee decided to schedule another hearing "to provide the parent with another opportunity to attend." The committee rescheduled the hearing for October 27, 2016. (Doc. 30-62, p. 7).

In a letter dated November 1, 2016, the superintendent notified Ms. Dowling that the disciplinary committee met and voted to expel R.E. for the remainder of the school year "with alternative placement." (Doc. 30-62, p. 9). The superintendent advised Ms. Dowling that she could appeal the decision to the Limestone County Board of Education if she felt R.E.'s expulsion was unjustified and indicated that she should contact his administrative assistant within 72 hours if she wished to appeal. (Doc. 30-62, p. 9). The superintendent provided his telephone number and email address and stated that Ms. Dowling could contact him if she had questions. (Doc. 30-62, p. 9).

Citing *Goss v. Lopez*, 419 U.S. 565 (1975), Ms. Dowling argues that these notices were inadequate. In *Goss*, the Supreme Court stated:

> [s]tudents facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in

98

> connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.

*Goss*, 565 U.S. at 581. The written notices addressed to Ms. Dowling meet the *Goss* criteria; the notices identify the charge against R.E. There is no evidence that R.E. denied the charge. R.E. and Ms. Dowling were at home when the indecent exposure incident occurred, and Ms. Dowling reached out to R.E.'s probation officer to report the incident. (Doc. 30-60, p. 6). Ms. Dowling attended the MDR that preceded the disciplinary hearing. At the MDR, R.E.'s IEP team reviewed the police report that R.E.'s homebound teacher made after the incident. (Doc. 30-60, pp. 1, 4-6). Thus, Ms. Dowling had adequate notice of the charge against R.E., R.E. did not deny the charge, and Ms. Dowling had notice of the evidence that the disciplinary committee might consider.

Accordingly, Ms. Dowling has not presented evidence that warrants submission of her due process claim to a jury. Therefore, the Court will grant the Board's motion for summary judgment on Ms. Dowling's due process claim.

## VI.

For the reasons stated above, applying the governing legal standards, the Court concludes that Ms. Dowling has not demonstrated that the Board violated the IDEA. Consequently, the Court grants the Board's motion for judgment on the

record on Ms. Dowling's IDEA claims.  Consistent with the discussion regarding

Ms. Dowling's non-IDEA claims, the Court grants the Board's motion for summary

judgment on those claims.  The Court reiterates its appreciation of the efforts that

Ms. Dowling has made on behalf of R.E. over his educational career and understands

the frustration that she experienced as she searched for answers and tools to assist

her son.

By separate order, the Court will enter a final judgment.

**DONE** and **ORDERED** this December 5, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE